## ROY CURRY v. THE STATE.

No. 2675.   Decided December 10, 1913.

Rehearing denied January 14, 1914.

1.—Seduction—Sufficiency of the Evidence.

Where, upon trial of seduction, the evidence was sufficient to sustain the conviction, there was no error on that ground, although the same was conflicting.

2.—Same—Rule Stated.

If the evidence is sufficient to sustain a conviction from the standpoint of the State, there is no reversible error, although the evidence from the defendant's standpoint would have authorized his acquittal. See opinion for facts sufficient to sustain a conviction.

3.—Same—Chastity of Prosecutrix—Presumption—Burden.

While the chastity of the prosecutrix in a case of seduction is an issue and must be proved as an essential element, it need not always be proved in the first instance, as it is presumed, and in such cases, if the accused relies on the fact of unchastity, the burden is on him to establish it, and the chastity of prosecutrix can be proved as well by circumstantial as by direct evidence, and where, as in this case, there is no circumstance that indicates otherwise than the chastity of prosecutrix, there was no error, under the charge of the court.

4.—Same—Evidence—Contradicting Witness—Limiting Testimony.

Where, upon trial of seduction, a defendant's witness testified that he as sheriff had seen the prosecutrix and had told her she must again appear and testify in the case, and that she replied that she was tired of going to court and that if she was again required to testify, she would say that defendant had not promised to marry her, there was no error in permitting State's counsel, on cross-examination of said witness, to show that said witness had never informed the prosecuting attorney of the alleged statement of prosecutrix, the court properly limiting said testimony to the credibility of the witness; besides, the bill of exceptions was defective. Davidson, Judge, dissenting.

5.—Same—Evidence—Contradicting Witness—Cross-examination.

Where, upon trial of seduction, a witness had testified for the defendant, after the State had shown that the latter was frequently seen in company with the prosecutrix at church, etc., tending to show that defendant had not often attended church with prosecutrix and that he had seen them there only once together; that he knew these facts because he was church clerk of the Baptist church and would have seen them had they attended church together, there was no error in permitting the State, on cross-examination, to show that said defendant's witness had had some difficulty with the mother of prosecutrix and that the Baptist church had withdrawn membership from him; besides, he tes-

tified that his ill-will towards the prosecutrix and her mother was not the cause of his being turned out of the Baptist church, and the bill of exceptions was defective. Davidson, Judge, dissenting.

### 6.—Same—Rule Stated—Cross-examination.

There are not two standards of testimony and cross-examination, one for the accused and the other for the State, but whatever testimony and cross-examination is permitted by an accused is also permitted in behalf of the State; the same rule applies to each and both.

### 7.—Same—Motive of Witness—Rule Stated.

Motives which operate upon the mind of the witness when he testifies are never regarded as immaterial or collateral matter.

### 8.—Same—Cross-examination—Rule Stated.

Great latitude is allowed in asking questions on cross-examination, and a witness may be asked any question, the answer to which may have a tendency to affect his credibility and to show his motive, even by independent facts and other witnesses. Following Green v. State, 54 Texas Crim. Rep., 3, and other cases. Distinguishing Roberts v. State, 70 Texas Crim. Rep., 297, and other cases.

### 9.—Same—Sufficiency of the Evidence—Corroboration.

Where, upon trial of seduction, the evidence of corroboration sufficiently sustained a conviction, there was no error.

Appeal from the District Court of Taylor. Tried below before the Hon. Thomas L. Blanton.

Appeal from a conviction of seduction; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

. *Cunningham & Oliver* and *W. S. Potter,* for appellant.—On question of insufficient corroboration of evidence: Curry v. State, 151 S. W. Rep., 319.

On question of impeaching witness: Roberts v. State, 156 S. W. Rep., 651; Hyden v. State, 31 Texas Crim. Rep., 401; Williams v. State, 24 Texas Crim. App., 637; Lewis v. State, 15 id., 647; Holsey v. State, 24 id., 35; Arnold v. State, 28 id., 480; Reed v. State, 42 Texas Crim. Rep., 572; Hudson v. State, 41 id., 453; Neill v. State, 49 id., 219; Hightower v. State, 53 id., 486.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, Presiding Judge.—Appellant was tried and convicted for seduction and his punishment assessed at the lowest prescribed by law. This is the second appeal. The decision on the first is reported in 68 Texas Crim. Rep., 262, 151 S. W. Rep., 319.

Appellant contends the case should be reversed on three grounds. First, that the evidence is insufficient to sustain the conviction. Second, because of the State being permitted to ask appellant's witness Stephenson certain questions on cross-examination. And third, because of questions propounded by the State to appellant's witness Dwiggins.

Judge Davidson has written an opinion herein in which he says the case should be reversed on all three grounds. I can not agree with him.

As to the first, he says the facts on this appeal are not materially different from that on the former appeal; that the judgment was then reversed because of a want of sufficient evidence. I think he is clearly mistaken in both of these statements. We showed in the former opinion that the evidence on that trial was not fully developed, and pointed out in some particulars wherein it was not. On this appeal the testimony for the State is developed and added to and thereby materially different, and much fuller and satisfactory than on the other.

The judgment on the other appeal was not reversed because of insufficient evidence, save and except on the one question of corroboration of the seduced girl. We expressly stated on the other appeal, "We sustain appellant's contention on that point, and on that point alone will reverse and remand this cause." Again, we said: "Yet, in this case the evidence was not developed sufficiently so that we can hold, as a matter of law, the evidence was sufficient to corroborate the prosecuting witness. These matters may be developed on another trial of the case sufficiently to authorize the jury to find and believe that the accomplice is corroborated, as required by law." For the want of this we said: "The judgment is reversed and the cause remanded."

We further therein held: "The law is that the testimony of the injured party in cases of this character does not have to be corroborated in each and all of the necessary elements of the offense, and that the corroborative evidence may be slight, and that the requirements of the statute are fulfilled if there be any corroborating evidence which, of itself, tends to connect the accused with the commission of the offense. Such corroboration only is necessary as is sufficient to satisfy a jury, beyond a reasonable doubt, of the truth of the charge, in connection with the testimony of the accomplice. Nourse v. State, 2 Texas Crim. App., 304; Jones v. State, 4 Texas Crim. App., 529; Tooney v. State, 5 Texas Crim. App., 163; Simms v. State, 8 Texas Crim. App., 230; Clanton v. State, 13 Texas Crim. App., 139; Moore v. State, 47 Texas Crim. Rep., 410, 83 S. W. Rep., 1117; Nash v. State, 61 Texas Crim. Rep., 259, 134 S. W. Rep., 709; Williams v. State, 59 Texas Crim. Rep., 347, 128 S. W. Rep., 1120; Bost v. State, 64 Texas Crim. Rep., 464, 144 S. W. Rep., 589; Murphy v. State, 65 Texas Crim. Rep., 55, 143 S. W. Rep., 616. . . . This must necessarily be the law and the proper consideration of the statute in cases of this character; for acts of intercourse between persons are always as secret and private as can be, and under such circumstances as the parties believe will prevent their detection or even suspicion at the time. Also, engagements of young persons to marry are made in private and in secret between them; and very generally, if not entirely, the fact of engagement, for at least some length of time, is kept as privately and secretly between them as can well be. Therefore proof, in the nature of these things, generally

can not be made other than by the testimony of the accomplice, corrobo-
rated by such circumstances as to time and place, opportunity, and the
course of dealing or treatment between the parties along about the time,
such as the man being the accepted suitor, devoting his attention at the
time to the girl, so recognized and understood by her family, his fre-
quent attendance upon her, the fact, if so, of his exclusive attentions to
her, and the attention of no other man to her during the time, and
such like matters."

It is true the evidence in this case is somewhat conflicting. In some
particulars the evidence may tend to dispute the State's witnesses and
the State's case. This is true in almost every case, and especially in
cases of this character. But the veracity of the witnesses, and the weight
to be given to their testimony, are necessarily for the jury and the court
below. The statute expressly so makes them. They are not for this
court. In such cases this court can and does pass on the question solely
as a question of law. If in law the evidence of corroboration is suf-
ficient, it is the duty of this court to so hold. But this court can not
usurp the duty and power of the lower court and jury to judge as to the
veracity of the witnesses and the weight to be given to their testimony.
The jury can believe one witness; although contradicted by many others.
The jury can believe part of the testimony of one witness, and reject
another part; it can believe the testimony of some of the witnesses on
some point and disbelieve the same witness on other points. These
principles of law and the application of them have so many times been
decided by this court and are so thoroughly and beyond question settled,
that it is needless to cite any case or authority.

The record in this case further shows that at least three trials of this
case have been had in the lower court. The first one in Stephens County
in December, 1911. The result of that trial is not shown by the record.
However, either appellant was convicted and granted a new trial or
there was a mistrial, one or the other. The venue of the case was then
changed from Stephens to Taylor County. On the second trial, the
appellant was convicted and appealed and his case reversed as shown
above. He was again tried and convicted, from which this appeal is
prosecuted. The learned trial judge before whom this trial occurred
presided in each of the other trials and heard all the testimony on each
trial. In the last two, he agreed with the jury as evidenced by his over-
ruling appellant's motions for a new trial in both instances. Again,
this record shows that there was a trial of another case in Stephens
County, wherein testimony in this case was given, and, in addition,
other testimony as to the charge of rape of this same girl intimately
connected with the appellant in this case in which the accused in that
case was convicted and, upon appeal, the case was affirmed by this court.
That case is Sam Wragg, who was a cousin of appellant, reported in 65
Texas Crim. Rep., 131, 145 S. W. Rep., 342. The same learned judge
who tried this, also tried the Wragg case and heard all the evidence

therein. Whether there was more than one trial in the Wragg case, this record does not disclose.

In considering the evidence herein, I will state and discuss it from the standpoint of the State's case. If sufficient from that standpoint, the law is met and the conviction should be sustained, although the evidence from appellant's standpoint would have authorized his acquittal.

It was agreed that Belle McFarlin, the seduced girl, was dead. The evidence, without contradiction, shows she died in November, 1911. An examining trial of appellant was had in December, 1910, at Breckenridge, before the justice of the peace, at which time Belle McFarlin testified. Her testimony was taken down in writing, signed and sworn to by her, identified and introduced on this trial. As stated by us on the other appeal, "we know that the practice . . . on examining trials is to give the substance only, and not the details." She testified that she was then 15 years of age; that appellant first began going to see her in September, 1909; the first act of carnal intercourse occurred in January, 1910. At that time, and before the act, he promised to marry her, and she submitted because thereof and would not have otherwise submitted. She believed appellant's statement made to her that he would marry her. Every time thereafter when he went with her, and they were alone, he renewed his promise to marry her; that she submitted to the first act of carnal intercourse on the ground of the promise of marriage made by him to her and never thereafter submitted except under this promise by appellant to her; that she lived in Stephens County at that time with her mother, her father having died about two years prior thereto.

That she first accepted appellant's promise to marry her in January, 1910; that he first proposed in September, 1909, but she did not then accept his proposition. At that time, September, 1909, he did not propose carnal intercourse with her. That she first began to love him in January, 1910, but did not let him have intercourse with her alone because she loved him, but because he promised at that time to marry her as well. She said: "I have stated previously that Sam Wragg had had intercourse with me and that I had not arranged with Sam Wragg for the meeting for such intercourse. I now say that Roy Curry arranged such meeting and it occurred three or four days before November 12 (*1912.*)" This quoted part of her testimony was introduced by appellant himself. Evidently "*1912*" is a clerical error. It should be *1910*. She died sometime in November, 1911. I have not undertaken to give a copy of her evidence, but the substance of it on the points mentioned.

Dr. Wharton testified: That he waited on Belle in a case of obstetrics at Mrs. McFarlin's on about the last of February, 1911, at which time she gave premature birth to a foetus of about six and a half or seven months; that the child lived four or five days.

This trial occurred in April, 1913. Mrs. E. A. McFarlin, Belle's mother, testified: That at the time of this trial she lived in Navarro

County, having moved from Stephens to Navarro County in 1912, but that prior thereto for several years she had lived in Stephens County; that at the time Belle died she was about 17 years old. She (Belle) was single, had never been married; that she (Mrs. McFarlin) knew appellant eight or nine years; that she knew him ever since they lived in Stephens County; that he was at her home there and came to see her daughter, Belle. The last year he came to see her he was there often,— about once a week. "The last week he came three times,—that was the week she left when this trouble came up." Prior to that time he had been coming to see Belle ever since 1908. He commenced in 1908. He did not come very often the first year. He commenced that year and came a right smart and then from that on he came regularly all the time. "My daughter, Belle McFarlin, never kept company with anybody else during that time. She went with him exclusively all the time; she kept company with him altogether and there was no one else waited on her during the time he waited on her."

On cross-examination she testified: "From September, 1909, on down until January, 1910, he went with my daughter, or came to see her regularly all the time, during that time. He was with her often. He was all the one that was with her. He would come there to the house. He pretended to carry her to preaching frequently. I went to preaching with them. I have been with them several times to preaching. I would see them at preaching together at Harpersville, and they went to Eolian to preaching together." That she saw them together at preaching at Harpersville one time in July, 1910. "They went to Eolian to preaching together. During 1909 and 1910 my family was composed of myself and my three little girls."

Mattie McFarlin, Belle's sister, testified on this trial: That she was then 15 years old; prior to their moving to Navarro County and now, she lived with her mother in Stephens County, as did her sister, Belle. That she had known appellant a long time. "He used to keep company with my sister, Belle McFarlin, before she died." He began in 1908, and kept company with her something like two years. "He came to see her two or three times a month. He carried her out driving a right smart,—about twice a month." She didn't know how many times during the two years he did come, but something like every other week or two or three times a month. "I never did see Belle going with any other boy during that time. She did not keep company with any other boys so far as I know, during that time. No other boys came to see her. As far as I know, she kept company exclusively with Roy Curry."

On cross-examination: That her sister and appellant did not have a breaking off that she knew of, in which he did not come to see her from about September, 1909, until January, 1910. That in July, 1910, she saw him carry her to preaching at Harpersville, she thinks it was a Methodist meeting.

The testimony in the record further shows satisfactorily that after the first act of intercourse had with appellant when he promised to marry

her that she continued from time to time thereafter to so indulge him, he, each time, promising to marry her. The testimony, as a whole, and no part of it, shows or tends to show, that any other, except appellant, had sexual intercourse with this girl prior to the time appellant seduced her and accomplished her ruin, nor any time shortly thereafter. She testified that Sam Wragg had had, but this act with Wragg was expressly arranged by applicant and must have occurred nearly a year after he had seduced and debauched her, and gotten her pregnant, and under such circumstances as shown in that case amounted to rape. Appellant introduced Trammel Lyles, who said he was 20 years old at the time this case was tried; that in the summer of 1910, he carried her home from church once and "I hugged her and kissed her and squeezed her a little bit." The testimony of this witness, on cross-examination, shows satisfactorily that the jury was clearly justified in believing his testimony was false. He claimed to be a great friend of appellant; that he lived in about two miles of where this girl lived, in the same neighborhood appellant lived; that he knew of all the previous trials of appellant in this case, and that he also knew of the trial of the companion case of Sam Wragg, and knew Wragg well; that he never testified in any of those trials during Belle McFarlin's lifetime and never told appellant anything about this testimony of his until he was trumped up on this, the last trial, and he didn't know how he came to be summoned this time as he had never told appellant or any other. In addition, Mrs. McFarlin and Mattie both testified positively that this witness was never with Belle and never took her home from church. But suppose his testimony was true and that the girl did permit the liberties he tells about. It occurred, by his own statement, several months after appellant had seduced and debauched her. What she did with others after the act of seduction and debauchery by appellant, should not, and under the authorities can not, show any defense for appellant. The testimony in this case further shows that the appellant began his attentions to this girl in 1908, when she was only fourteen years of age and that he pressed his suit vigorously in and after September, 1909, and seduced and debauched her in January, 1910, when she was only 15 years of age. Mr. Wharton, in his Criminal Evidence, vol. 1, p. 668, says: "While the chastity of the prosecutrix is an issue and must be proved as an essential element, it need not always be proved in the first instance, as it is presumed; and in such cases if the accused relies on the fact of unchastity, the burden is on him to establish it." This court in Bost v. State, 64 Texas Crim. Rep., 464, said: "Judge Willson for this court, in Lagrone v. State, 12 Texas Crim. App., 426, said: 'The law presumes a female to be chaste until the contrary is proved.' The law so presuming, and the jury being presumed to know the law, it can also act upon such presumption." There can be no doubt but that chastity can be proven as well by circumstantial evidence as by direct. As stated above, the law presumes this young girl was a chaste girl prior to the time appellant seduced and debauched her. There is no circumstance and no testi-

mony, the slightest, that indicates otherwise. The court, in his charge in this case, required the jury to believe beyond a reasonable doubt that she was a chaste girl at the time and before appellant seduced and debauched her. The jury by their verdict believed beyond a reasonable doubt that she was a chaste girl, at and prior to the time appellant seduced her. Again, the evidence clearly and satisfactorily shows, and justified the jury to believe, that no other than appellant had the opportunity to have sexual intercourse with her at and prior to the time she testified he seduced and debauched her. He alone is shown to have had such opportunity. All the facts and circumstances, without doubt and without question, satisfactorily show that no other than appellant caused her pregnancy. That some one had such intercourse with her is established beyond dispute by the fact that she became pregnant and was delivered of a child. No other reasonable conclusion can be drawn from any part of the testimony, or the whole of it, than that this young girl, at the solicitations of appellant, became engaged to be married to him, and by reason thereof, at his solicitation, and relying upon his promise, he induced her to have sexual intercourse with him, and that he alone, in this way, ruined and blasted her young life. In my opinion the evidence not only shows that he, and he alone, was guilty, beyond a reasonable doubt, but that this young girl, in her testimony, by all the facts and circumstances, has been amply and sufficiently corroborated.

Appellant has but two bills of exception which raise his other questions. By the first it is shown that Matt Stephenson, whom he introduced as a witness, on direct examination testified that he was sheriff of Stephens County in the years 1911 and 1912, and was acquainted with Belle McFarlin and appellant, when they lived in that county. That in July or August, 1911, he had a conversation with Belle McFarlin at Abilene at the residence of Jim and Lovey Lane; that he told her that she would have to go to court at Breckenridge; that she then said to him she did not want to attend court any more, and he asked her why, and she said she was tired of attending court; that she was going to get rid of court when she got down there next time; that he asked her in what way, and she said she was going to swear that appellant did not promise to marry her; that he told her that if she did the grand jury would indict her for perjury because she had so sworn in her testimony before the grand jury who indicted appellant, and if she now should swear otherwise the grand jury would indict her for perjury. She said it made no difference she was going back and swear that, that she was tired of attending court.

That after this witness had so testified, the district attorney, on cross-examination, asked and the witness answered as follows: "Q. Now, she told you this in the latter part of July or the first of August? A. I believe it was. Q. And you were sheriff of Stephens County at that time? A. Yes, sir. Q. And I was district attorney. A. Yes, sir. Q. And you never breathed that to me? A. No, sir. Q. You know this defendant at that time was charged with seducing her? A. Yes,

sir.  Q.  And you never breathed that to me or any one connected with the prosecution until after the girl had been dead a couple of months, did you?  A.  No, sir, I did not mention it to you until a couple of months after she was dead, because I did not see you.  Q.  Why didn't you mention it to the different grand juries, so that if that girl did falsify, she could be indicted?  A.  I did not think about it being evidence.  I didn't think about the matter until the case was called, that is, that it would be admissible testimony, because I did not think about the girl going to die.  I didn't know anything about the girl going to die."  Appellant objected to these questions and answers, because "the same was wholly irrelevant and immaterial and because the defendant could not be bound by what the witness did or did not do."  Whereupon the court in part sustained said objection with the statement that the jury would not consider said testimony for any purpose whatever against the defendant, but that it was admitted before the jury only upon the issue of the credibility of the witness Stephenson and upon no other issue, and verbally instructed the jury that they could only consider said testimony in passing upon the credibility of said witness.  Whereupon the defendant again objected to said testimony even with the limitation given by the court, for the reason that the witness was a witness for the defendant, and that to attack the credibility of the witness would be to attack the credibility of defendant's witness, and it would be harmful to defendant.  And further objected that it was not proper testimony by which to discredit a witness, and was therefore irrelevant and improper, even with the limitation placed upon it by the court."  The court, in approving this bill, corrected and explained it as follows:  "It was the theory of the State that the prosecutrix had not made the statements to the witness Stephenson, claimed by him to have been made, and further that in calling on the girl in Abilene, he did so with an improper motive.  The evidence showed that said witness was not the sheriff of Stephens County on the date of this trial, but was sheriff only during the years 1911 and 1912.  The witness Stephenson testified to the following facts:  'I wired Ben Peevey to meet me at the train with this girl Belle McFarlin; that I wanted to see her and talk to her.  I won't say whether Ben Peevey met me there or not, but she met me there at the train.  I got off the midnight train and went with her to Jim Lane's house from the depot.  We did not go to the Commercial Hotel.  We went to Jim Lane's house.  I did not stop off here and stay all night in Abilene.  I stayed here until about two o'clock I think.  I did not stay here in Abilene that night.  I went from here to Cisco on a caboose on a freight train.'  (Tr., p. 12.)  Then as to a former trip he had made to Abilene to see the prosecutrix, he testified:  'The first time I came over here I came over with a subpoena for her.  I got that subpoena at Breckenridge.  It was not addressed to the officers of Taylor County.  It was addressed down there to the officers in Stephens County.  I didn't have any authority to come to Taylor County and serve that subpoena.  I did not serve that

subpoena on Belle McFarlin because I did not have it with me.' (Tr., p. 13.)

"In admitting the testimony complained of by the defendant the court at the time instructed the jury that they could not consider the same against the defendant for any purpose whatever, and admitted it only upon the issue of the credibility of said witness, and for no other purpose, and in the court's written charge to the jury, he likewise limited this testimony."

As the discussion of this bill, to a large extent, embraces a discussion of the other also, I will now state the other, and discuss them together.

The other bill shows that the appellant introduced R. J. Dwiggins, who, on direct examination, among other things, testified: (I quote from the bill as follows): "My name is R. J. Dwiggins, I live at Breckenridge in Stephens County. I have been a citizen of Stephens County about ten or twelve years. I lived in or near Harpersville. I moved to Breckenridge along about the first of September, 1911, and I lived at Harpersville all of the rest of the time. I lived at Harpersville prior to September, 1911. I was church clerk of the Baptist Church all of the time I was at Harpersville. I attended church there at all of its meetings there. I know the defendant Roy Curry. I saw Roy Curry there in company with Belle McFarlin one time, that was in the latter part of the summer or early part of the fall of 1910, I think. That is all the time I ever saw him there with her. I attended all of the meetings during 1909 and 1910 up to September. On cross-examination by the State said witness further testified: 'I don't think they could have been there and me not have seen them. I don't know who all was there the night I saw Roy and Belle there. I carried Belle there in my hack. Belle and Mattie, that is the reason I know, and Roy and Belle got together after we got to church.' On redirect examination he testified: 'I carried Belle McFarlin to church and she went back, I carried them home that night. I went plumb on around and carried them home. I carried her up there to preaching and carried her back home. Curry was with her at preaching, but didn't carry her home.' After further cross-examination by the State, the witness was excused, and the trial proceeded until the defendant had rested his case." The bill then further proceeds; that said testimony was very material for appellant for the reason that the State had proven by Mrs. McFarlin, Belle's mother, and Mattie, Belle's sister, among other things, that appellant had carried Belle to preaching frequently; that they, the witnesses, went with them and had seen them at preaching several times, and that they went to preaching several times at Harpersville, and said Dwiggins' testimony was material to disprove the said testimony of the mother and sister of Belle. And that after appellant had concluded his testimony and rested his case, the State, in rebuttal, had said Dwiggins called to the stand, and, over appellant's objection, the district attorney asked, and the witness was required to answer as follows: "Q.

As I understood your testimony this morning you testified that you were church clerk at Harpersville, was it? A. Yes, sir. Q. Now, I will ask you this question, if it is not a fact that the Baptist people withdrew fellowship from you, or turned you out of the church on account of the trouble you had with Mrs. McFarlin and Mattie?" Whereupon appellant objected to the question and answer because "it is irrelevant and immaterial, and an improper way to impeach a witness." The court then stated to counsel and the jury that he would admit said testimony only in rebuttal to testimony elicited by the defense on direct examination and instructed the jury verbally that they would not consider said testimony against the defendant for any purpose whatever; that it was not evidence against the defendant at all and "you can not consider it against him for any purpose whatever. If you should consider it for any purpose, it is admitted only upon the issue of the credibility of the witness and upon no other issue, and the court permits it only in rebuttal to that which the defendant has brought out." Whereupon, appellant again objected to its introduction even for the purpose of being considered by the jury in passing upon the credibility of a witness, it not being proper evidence on which to impeach a witness. The court overruled the objection and the witness answered, "No, sir, that was not it at all." Whereupon, the district attorney, over the same objection, asked the following question: "Q. What was the trouble about? And the defendant again made the same objections as before, which were overruled, with the limitation as before, and the witness answered: 'It is not a fact that the Baptist people at that place withdrew fellowship from me, or what is commonly known as turned me out of the church, on account of trouble I had with Mrs. McFarlin and Mattie McFarlin.' They did withdraw fellowship from me afterwards. They withdrew fellowship from me after I moved to Breckenridge. They were going to withdraw fellowship from me one month before I left, but for some cause, I don't know why, they did not do it at that time." Appellant again stated that he objected to it being considered by the jury in passing upon the credibility of the witness, because it was not such testimony in law to impeach a witness, and that it was damaging to the defendant and harmful. The court in qualification and explanation of this bill, in allowing it, stated: "The witness, Mrs. E. A. McFarlin, testified on cross-examination, in reply to questions asked her by the defense: 'He (Roy Curry) was with her often (meaning with her daughter, the prosecutrix). He was all the one that was with her. He would come there to the house. He pretended to carry her to preaching frequently. I went to preaching with them. I have been with them several times to preaching. I would see them at preaching together at Harpersville, and they went to Eolian to preaching together. I saw them at preaching together in Harpersville in 1910, but don't remember what portion of 1910.' (Tr., p. 2.) Up to this time the State had introduced no testimony whatever about any church services, and all of said testimony concerning church services was elicited by the

defense. Such evidence did not show that the services attended was at the Baptist, or Presbyterian, or Christian, or Methodist Church, or that Harpersville and Eolian were the only places attended. The State did not ask Mrs. McFarlin any question about church service. Then after the defendant had elicited such testimony from the said Mrs. McFarlin, the defense introduced the witness Dwiggins, and proved by him that: 'I lived at Harpersville prior to September 1, 1911. I was church clerk of the Baptist church all the time I was in Harpersville. I attended church there at all of its meetings there. I saw Roy Curry there in company with Belle McFarlin one time.' (Tr., p. 20.) Then on cross-examination he testified: 'I don't like the McFarlins very much. I was not down there when Mattie got after me with a shot gun. I was up on the road going home, and they met me at the mail box.' (Tr., p. 21.) It was the opinion of the court, that since the defendant had elicited all of the testimony about the church services, and had proven that the witness Dwiggins was clerk of the Baptist church, and to thereby leave the impression that it would have been impossible for the defendant to have been at church with the prosecutrix, as said Dwiggins did not see him but once, that the State would be permitted to show in rebuttal, that he did not remain clerk, as he was put out of the church, and therefore was not in a position to state who attended its services. And the court duly limited the testimony, and instructed the jury that they could not consider such testimony against the defendant for any purpose whatever, but that if they considered it at all, it was admitted only upon the issue of the credibility of said witness, and for no other purpose."

I have thus given the full substance, and almost literally both of these bills.

This court has, in a great many cases, held that such objections as were made by appellant in both of these bills were wholly insufficient to require this court to consider them. It is unnecessary to collate them all. I cite only a few. Hamblin v. State, 41 Texas Crim. Rep., 135; Ball v. State, 44 Texas Crim. Rep., 185; Masterson v. State, 34 S. W. Rep., 279; Carter v. State, 40 Texas Crim. Rep., 229; Spiars v. State, 50 S. W. Rep., 948; Barfield v. State, 41 Texas Crim. Rep., 19; Neely v. State, 56 S. W. Rep., 625; Howard v. State, 57 S. W. Rep., 948; Wade v. State, 37 Texas Crim. Rep., 401. For other cases see section 857, p. 557, and section 1123, p. 732, White's Ann. C. C. P.

However, I do not base my opinion in this case on the insufficiency of these bills, or either of them. I will treat the questions attempted to be raised by them, on their merits. I lay down these propositions, which are established by all the text-book writers on the subject, and by every well considered opinion by every court of last resort where the questions are treated:

(1) There are not two standards of testimony and cross-examination —one for an accused, and the other for the State—but that whatever testimony and cross-examination is permitted by an accused is also per-

mitted in behalf of the State; that the same rule applies to each and both; that "what is sauce for the goose is sauce for the gander."

(2)   Motives which operate upon the mind of the witness when he testifies are never regarded as immaterial or collateral matters.

(3)   Great latitude is allowed in asking questions on cross-examination. A witness may be asked any question, the answer to which may have a tendency to affect his credibility. And if he denies anything that would show a motive for or *animus* to testify against a party, it may be shown by other witnesses and by independent facts.

It is needless to cite all the text-books or all the cases establishing these rules. The books are full of them, and there is no well considered case by any court or any text-book writer that holds to the contrary.

In 40 Cyc., p. 2666, it is correctly stated: "A witness may be interrogated as to his relations with or feelings towards a party, or, in a criminal case, *towards the prosecuting witness or victim of the crime.* Inquiry in such cases is not limited to a mere question as to whether any feeling exists, but the witness may be interrogated as to particular facts tending to show his hostility toward, or his bias or prejudice for or against a party."

Mr. Underhill on Criminal Evidence, section 222, correctly says: "The feelings, bias and relationship of the witness are never collateral. A witness may be interrogated on cross-examination as to his interest, bias or prejudice, that is to say, if the sole purpose of the question is to elucidate the existing or previous relationship, feeling or conduct of the witness *toward the crime, the accused or the prosecutors.*  .  .  . If the witness refuses to answer such questions, or answers them in the negative, the contrary fact may be shown by the evidence of others."

In Blunt v. State, 9 Texas Crim. App., 235, this court, by Judge White, lays down the rules, cites Wharton and Greenleaf, and cases, and quoting from some of them, says: "Great latitude is allowed in the questions which a party is permitted and entitled to ask on cross-examination; and he will seldom be stopped by the court unless the question be manifestly irrelevant to the case, and calculated neither to qualify the examination in chief nor to impeach the credit of the witness.  .  .  . Generally, on cross-examination, a witness may be asked any question the answer to which may have a tendency to affect his credit,  .  .  . and, generally, he may be asked questions which affect his veracity or his memory: such as  .  .  . whether he is a relative or intimate friend, or under any special obligation to the party who calls him; whether he be not identified or connected with him in interest; whether he has not been on terms of enmity with the adverse party; whether his memory is not defective generally, or as to the particular transaction. Such questions are within the circumference of the issue, although not within that innner circle to which the examination in chief is confined."

Judge White also in Daffin v. State, 11 Texas Crim. App., 76, says:

"Generally on cross-examination a witness may be asked any question which may have a tendency to affect his credit, and it is the right of the defendant to show the *animus* and bias of a witness towards him, and its extent, if he can," citing authorities. And that case was reversed because the lower court refused to permit the defendant to state the nature and cause of difficulties the witness had had with the defendant.

In Watts v. State, 18 Texas Crim. App., 381, Judge White again said: "In a criminal prosecution it is not only permissible to ask, but a witness may be compelled to answer questions concerning his motives and his prejudices. He may thus be required to explain whatever would show bias on his part, or incapacity to testify accurately. (Whart. Crim. Evid., section 477.) A defendant has the right to show bias on the part of the witness, if he can. In such examination great latitude is allowed where the object is to impeach the credit of the witness. (Blunt v. State, 9 Texas Crim. App., 234; Daffin v. State, 11 Texas Crim. App., 76.)" And that case was reversed because the lower court refused to permit the defendant to read an indictment against the witness for fraudulently obtaining the same mule which defendant was accused of stealing.

The case of Gelber v. State, 56 Texas Crim. Rep., 460, was a prosecution for unlawfully selling intoxicating liquors to a minor, Guy George. The State introduced him and his two brothers to establish the illegal sale. The appellant, on cross-examination of one of Guy's brothers, sought to prove by him that a few days before this alleged violation he and Guy went to appellant's place of business and cursed and abused him and his family, calling them damned Jews and further stating that they intended to kill out the whole bunch. This court, in an opinion by Judge Davidson, reversed that case because this testimony was not admitted. Again, in that case, for the purpose of showing animus of the complaining witness, Guy George, the defendant offered to prove by two witnesses that they were at Gelber's place of business during Christmas week, at a time *which was subsequent* to the charge in that case against the appellant, and that Guy George, in their presence, demanded of the appellant that he sell him beer; that appellant refused and ordered him off the premises, and that Guy George became angry, snatched a glass of beer from one of these witnesses, ran out of the store and drank it, and at the same time cursed, abused and vilified appellant and appellant's entire family. This court reversed that case also on the ground that the court refused to permit this testimony. This Gelber case has several other like questions which Judge Davidson held were admissible and reversed the case because they were not admitted.

In Sexton v. State, 48 Texas Crim. Rep., 497, this court, by Judge Davidson, held that for the purpose of showing bias, friendship and close relationship to appellant and the witness' interest in testifying in his behalf, and consequently touching her credibility, that it was proper for the State to prove on the cross-examination of the witness, a woman, that she had lived in adultery with the defendant for five or six

years; that she knew defendant had a living wife and child while she was living with him in adultery; and that while appellant was in jail she visited him there. Again, in that case he held that it was proper for the State to require a witness to detail on the witness stand all the occupations and businesses which he had been following for the past three or four years.

In Green v. State, 54 Texas Crim. Rep., 3, this court, through Judge Ramsey, said: "It is well settled that on cross-examination of a prosecuting witness that defendant ought of right be allowed a wide latitude in the introduction of evidence that may have the effect to discredit such witness."

In Crist v. State, 21 Texas Crim. App., 361, Judge Hurt, for this court, showed that in a prosecution for murder Mrs. Anderson was an important witness for appellant and gave material testimony in his favor. The district attorney, on cross-examination, asked her if she was not separated from her husband and if defendant was not living in the same house with her; to which defendant objected because irrelevant and incompetent. The objections were overruled, and the witness answered the questions in the affirmative. Judge Hurt said: "Mrs. Anderson was a very important witness. She swore to facts clearly exonerating appellant and the State had the right to show the relations existing between her and defendant, in order to show her bias and motives, which may have explained her testimony."

· In Rosborough v. State, 21 Texas Crim. App., 672, Judge Hurt, for this court, again said: "The animus, the motive, or the ill will of a prosecuting witness—the injured person—is never a collateral or irrelevant question in a criminal case. The bias, the prejudice, thus shown is, in most cases, of the utmost importance, and is always material in order to enable the jury to form a correct judgment as to the credit to which the testimony of the witness is entitled."

There is no need to take up other text-books, and cases of this or any other court to establish, beyond question, these principles. The books are full of the cases and no well considered case can be found to the contrary. Mr. Branch, in his Criminal Law, section 861, and in section 871, p. 554, states the principles and collates a large number of cases from this court to the same effect. This court, through Judge Davidson, in Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611, and Earles v. State, 64 Texas Crim. Rep., 537, 142 S. W. Rep., 1181, cites and approves those principles and many other cases recently decided by this court, reiterates and collates many cases to the same effect. Burnaman v. State, 70 Texas Crim. Rep., 361, 159 S. W. Rep., 244.

Now as to the first bill above about Matt Stephenson's testimony. The defendant proved by him that he was the high sheriff of Stephens County where the appellant and this unfortunate girl had lived and that he knew them, and that he knew of the prosecution of appellant there for this crime. The appellant sought, and thereby obtained, the high official

position of this witness for the purpose of adding strength and force to his testimony. In 35 Cyc., 1532, it is correctly said: "The duties of a sheriff are in a large measure the same as are imposed on police officers, and he necessarily exercises police powers and must enforce the laws enacted for the protection of the persons, lives, property, health and morals of the people." The laws of our State make him such peace officer and, as such, imposes upon him these duties. In many instances our law expressly requires that he shall report to the prosecuting officers, the district and county attorneys, and the grand juries violations or contemplated violations of law; and as this court said in Minter v. State, 70 Texas Crim. Rep., 634: "In fact the whole theory and purpose of our laws are that the peace officers especially, shall do everything and all things necessary or proper to prevent, suppress, and punish crime." They, in a large measure, are representatives of the State, as well as are the district and county attorneys. In this instance this officer, by his testimony, sought to break down the case against appellant and testify in his favor. . Appellant had him testify to his official position as sheriff at the time he claimed he talked with this girl, though he was not such sheriff when he testified, and threatened her with indictment by the grand jury. Under such circumstances it was not only right, but the duty of the district attorney, by any and every legitimate cross-examination, to show facts that would affect his credibility and, in my opinion, there can be no question but that the cross-examination of this high sheriff by the district attorney on the very matter brought out by appellant, was not only in every way proper and legal, but it was his duty to thus break down and affect his credit as a witness.

This poor girl was dead. The State had no opportunity to have her testify and deny this sheriff's evidence. Ordinarily, no witness can be impeached by showing that he has made a statement to the contrary or different from his testimony without first examining him on the subject, and giving him an opportunity to deny or explain it. It is a hard rule, therefore, that will permit the impeachment, by this method, of a dead witness. It is only so because of the fact that the witness is dead and can not be asked the questions.

The case of Roberts v. State, 70 Texas Crim. Rep., 297, 156 S. W. Rep., 651, and Hyden v. State, 31 Texas Crim. Rep., 401; Williams v. State, 24 Texas Crim. App., 637; and Lewis v. State, 15 Texas Crim. App., 647, cited by Judge Davidson, and neither of them, are in point to support appellant's contention and Judge Davidson's opinion in this case. Take the Roberts case. This court in that case did not hold that the questions which were asked the witness Johnson, if he had not failed to tell the prosecuting attorney the night before, what he then testified to, for the purpose of impeaching him, was improper. Those questions to Johnson were entirely proper; but Johnson, in his evidence, showed that he was not asked any question by these attorneys at that time calling for his telling them, and nothing was called for from him then that would cause him to then tell them. This court held that under

such circumstances it was improper to thereupon, put on as a witness one of these attorneys and ask and prove by him that Johnson had failed to tell them. In order words, what was asked Johnson for the purpose of impeaching him was entirely proper, but, as he made an explanation which was not disputed showing he had so failed to tell them, and why, this court held it was then error to put on another witness to prove he did not then tell them what he now testified. The decision in the Roberts case has no application to this. Each of the other cases just above cited are precisely to the same effect and are no authority for holding that the said cross-examination of the sheriff in this case was inadmissible. On the contrary, each of those cases recognizes and states the correct principle, which is entirely applicable to this case, and which shows that this cross-examination by the district attorney of the sheriff was entirely proper. Judge Willson, in the Williams case, *supra*, says: "And a witness may be discredited by proof that he now states facts which on a former trial he omitted to state. And generally, whenever, on a former occasion, it was the duty of the witness to state the whole truth, it is admissible to show that the witness, in his statement, omitted facts sworn to by him at the trial. But it is only upon a denial, direct or qualified, by the witness, that such statements were made, that proof of them can be made," citing Whart. Cr. Ev., sections 482, 483. Each of the other cases above cited expressly recognize this rule and hold that the testimony of other witnesses impeaching them on this ground was inadmissible because the witness had not denied them, or, if so, so testified as to show that their testimony was not called for on the previous occasion.

Now as to the cross-examination of Dwiggins, shown by the other bill. The principles and authorities above cited, quoted from and discussed, show, without question, that this cross-examination of Dwiggins was entirely proper. The State did not go further and show, as it had the right to show, that Dwiggins was turned out of the Baptist church because of his conduct toward Mrs. McFarlin and her daughter Mattie, so as to show his intense feelings against them, and account for his testimony. His whole testimony, as well as the bill, shows that he was highly prejudiced against the State's witnesses, and case, and was in favor of appellant, and especially that his testimony was given because of his ill-feeling and hostility to Mrs. McFarlin and her daughter Mattie, caused by their attack on him with a gun. The State had the right to go into the particulars of this matter but did not attempt it. It is evident from the bill, and from the record, that at the time Dwiggins was giving his testimony in chief, the State's attorney was not advised of these facts and had no opportunity to get witnesses from Stephens County to prove the fact that he was turned out of the Baptist church, because of his treatment of Mrs. and Miss McFarlin. This witness testified this was the first time he ever testified in this case. That he did not like the McFarlins. Appellant had him testify he was church clerk, thereby getting the benefit of this fact to bolster up his evidence,

in addition to show he was in position to know what he stated. If this fact could be thus used by appellant, certainly the State had the right to cross him on this very point, and if it could, show he had been turned out of the church and about these very McFarlins so as to show the extent of his ill-will toward them, and to lessen the effect of his church membership in bolstering his testimony for appellant, and further to show he was not then a member of the church, so as to show he was not in position, as he testified, to know appellant was not with said girl. Otherwise, when a witness against the State so testifies as to his standing and position therefrom, as to show the probability of his truthfulness, the State is utterly helpless by cross-examination to develop the true facts, or test him to see if he is telling the truth. Such is not the law, never was and I hope never will be.

But suppose the State had not had the right to thus cross-examine this witness. He testified positively, and no one disputed him, that his treatment of Mrs. and Miss McFarlin, or their treatment of him, was not the occasion for his being turned out of the Baptist church, and instead of the cross-examination being injurious to appellant on that account, it was in his favor. The authorities in this State are abundant to sustain this proposition. In this instance the appellant had his witness Dwiggins to testify that he was church clerk of the Baptist church. This was for the purpose and had the effect of showing his high standing and of bolstering up the credibility of this witness before the jury. Then it was clearly permissible by the State, in cross-examination, if it could do so, as a question affecting his credibility to show that this same church had at that time turned him out, because of his conduct towards these important State's witnesses who were as a matter of fact the prosecuting witnesses in this case. They were representatives and relatives of the poor dead girl, and the appellant's attack of them by his said testimony and his testimony in appellant's favor, could not but help be affected by this witness' hostility to them and theirs to him, which he knew, and as a result of which the State asked him if he had been turned out of the Baptist church on account thereof. But as said above, as he denied this and the State did not attempt to contradict him, the appellant could not have been and was not thereby injuriously affected. If it had any effect at all it was in his favor and not against him.

In my opinion there is no question but that appellant's guilt is amply shown by legal and competent testimony; that no injury whatever is shown to have occurred to him on the trial of this case which could or should result in the reversal of this judgment, and, in my opinion, the judgment should be affirmed, and it is so ordered.

*Affirmed.*

DAVIDSON, Judge (dissents), cites opinion on former appeal. The impeachment of the witnesses was error.

HARPER, Judge.—I agree to the affirmance of this case as I think

the authorities sufficient under the holding in the Nash case, 61 Texas Crim. Rep., 259.   As to the questions asked the witness Dwiggins, I think it was permissible to ask him if "he had not been turned out of the church on account of trouble with the McFarlin family," as showing ill-will, bias, etc., and the court did not err in overruling the objection to this question.   But when the witness answered that it was not true, the State should not have been permitted to ask him if it was not a fact that he had been turned out of the church, unless they intended to connect up the matter with the McFarlin family.   But, inasmuch as the defendant proved that he was church clerk to support his testimony, this latter question, and the answer thereto, under the record in this case, would not present reversible error, although in the opinion of the writer improper.

[Rehearing denied January 14, 1914.—Reporter.]