Willie Odell v. The State.

No. 3961. Decided March 8, 1916.

1.—Assault to Rape—Evidence—Credibility of Witness—Ill-will—Motive —Acts of Third Parties.

Where, upon trial of assault with intent to rape, the prosecutrix, who was a girl about fourteen years of age, testified that she was assaulted by some one who threw a blanket over her head and attempted to ravish her and that during the struggle she recognized defendant, and that when her parents returned she notified them of the assault, and it was also in evidence that prosecutrix had stated to different persons after the occurrence that she did not know her assailant, and her younger brother also testified for the State that he heard the outcry of his sister when she called defendant's name at the time of the assault and then saw the defendant running off, and the parents of the prosecutrix did not testify, and the evidence further showed that these children were minors under the control of prosecutrix's parents, and the boy had made the statement a day after the occurrence that he thought it was not the defendant. Held, that it was reversible error not to permit the defendant to show that the father of the prosecutrix had brought a sequestration suit against the father of the defendant about the time the complaint against the defendant was filed, and had thereafter agreed to compromise the prosecution and the civil suit with the father of the defendant who refused to compromise, and that thereupon, said father of the prosecutrix became very angry, etc., to show the bias, prejudice and ill-feeling of the said father of the prosecutrix and that he influenced his children to testify falsely. Following Edwards v. State, 172 S. W. Rep., 252, and other cases. Prendergast, Presiding Judge, dissenting.

2.—Same—Practice in District Court—Removing Wife and Child of Defendant from Court Room.

Where, upon trial of assault with intent to rape, after both sides had closed their evidence, the court suspended proceedings, retired the jury and instructed the officer to remove the wife of defendant and her baby from her seat by her husband in front of the jury inside of the railing of the bar, and when afterwards the child returned to defendant who placed it on his knee, the court went through the same proceedings and had the child removed and sent back to its mother; the court qualifying defendant's bill of exceptions to the effect that

under the rule of the court he did not allow relatives to sit by defendant at the bar. Held that this action of the court may have tended to impress the jury against the defendant, and that under the circumstances of this case it was improper. Prendergast, Presiding Judge, dissenting.

Appeal from the District Court of Callahan.   Tried below before the Hon. Thomas L. Blanton.

Appeal from a conviction of assault with intent to rape; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

*J. F. Cunningham,* for appellant.—On question of excluding testi-· mony with reference to ill-will of father of prosecutrix growing out of certain litigation: Wade v. State, 171 S. W. Rep., 713, and cases cited in opinion.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of removing wife and child from the courtroom: Cases cited in opinion.

On question of permitting testimony as to civil suit of father of prosecutrix against defendant's father, and offer of compromise: Maines v. State, 23 Texas Crim. App., 568; Favors v. State, 20 id., 155; Knock v. State, 142 Mo., 526; Jeager v. State, 66 id., 180.

DAVIDSON, Judge.—Appellant was convicted of assault to rape, his punishment being assessed at four years confinement in the penitentiary.

The State's testimony is to the effect that the alleged assaulted girl, Emily Smith, was over fourteen years of age. Appellant and his wife were at his father's residence, and had been for a short time, appellant working about the country at various jobs. The father and mother of the prosecutrix were in Wilbarger County, and had been for three or four weeks. The father of prosecutrix was a renter of the elder Odell, occupying a small house on the property and about 400 yards east from the residence of Mr. Odell. During the absence of her father and mother prosecutrix and her brother and sister were guests of the senior Odell. On the morning of the alleged assault, which was Sunday, appellant took a gun with a view of going wolf hunting. His course lay westward. The house where prosecutrix went, and which was the home of the father of prosecutrix, was about 400 yards east of the senior Odell's residence. The defendant's version as to his whereabouts, proved by several witnesses, was that he was something like thirteen or fourteen hundred yards west of the house at the time of the alleged assault, at a wolf den. That he had gone with a view of catching young wolves. He was seen by the various witnesses at that point. Later he went from that point north, then east, hunting wolves. Without going into detail as to his preambulations, about 9 o'clock that morning, or half past 9 he was at the residence and spent a couple of hours with Mr. Peterson and two or three other parties, having his gun with him, presenting

no appearance of being agitated or excited, and from there he returned to his father's residence, reaching there about noon.

The State's version as given by the girl, in the main, is slightly corroborated as to one or two matters by her brother and sister, who were present at the little house where the assault is said to have occurred. The prosecutrix testified that it was her custom to go in the morning from the residence of the elder Odell to the little place where the family lived to feed the chickens, and on this particular morning it was something like 8 or 8:30 o'clock when she went to the house. As she entered the house somebody unrecognized by her threw a quilt over her head, tied it around her neck so that she could not see, threw her down, tied her wrists together with a string, and undertook to have intercourse with her; among other things, tore the left leg of her drawers from the bottom up to or near the waist band. About that time one of the children on the outside began calling a kitten and came to the door and knocked, whereupon her aggressor jumped through the window; the window was a small one in the north side of the house, the door being in the east, and these two being the only apertures in the house. The panes of glass in the window seem to have been broken. Under the window there were ashes, thrown from the fireplace or stove. In these ashes were found no tracks by the parties who investigated the place after the girl had returned to the elder Odell's home. She said the ashes were hard; the other witnesses contradicted her as to that. There were no tracks found going from the house, and the State introduced some evidence to show that the ground was hard. The brother of appellant's wife and one or two children and the small baby of appellant had followed the prosecutrix to within seventy-five or one hundred yards of the little house where the assault is alleged to have occurred, and was there at the time trying to get a rabbit out of a hole in a tree. She made no outcry at the house, but accounts for this by reason of the quilt being over her head. She says when the party attacking her went out of the window she remarked, "Willie Odell, you will be hung for this." That he then looked at her and she recognized him. One of the children who was with her testified that he heard that statement, but neither one of these children seemed to have seen anybody. The brother of appellant's wife, who was trying to get the rabbit out of the hole, testifies that the girl came where he was and that her wrists were tied together by a string and that he cut the string. This witness testified that in discussing the matter with prosecutrix she stated that somebody had tried to smother her to death, but that she did not know who it was. In fact, the whole record shows that it was about ten days before her father returned, and that in talking with the people who discussed the matter with her she always stated she did not know who it was. She accounts for this by stating that these people were in some way related to appellant and she did not want to tell them because she did not know what they would do to her. The witness who was seventy-five or one hundred yards away saw nobody leaving the house. The prosecutrix further testifies that when her father

and mother returned she told them about the transaction, and that it was appellant who made the assault on her. They returned on Saturday, some ten days after the occurrence. On the following day or Sunday a friend and neighbor, Miss Gillett, visited prosecutrix after the return of her parents, and the matter came up for discussion between prosecutrix and Miss Gillett. In that conversation she told Miss Gillett that she did not know who had made the assault on her. This was the day subsequent to the time she says she told her father and mother that it was appellant. She says the reason she did not tell Miss Gillett about the matter was that she was related to appellant, and she was afraid Miss Gillett would tell things prosecutrix did not say or state. There is also testimony by some ladies, to the effect that on Sunday evening after this alleged assault should have occurred Sunday morning, that they, in company with prosecutrix, went in swimming, and they saw prosecutrix undress and go in bathing, and that her drawers were not torn. There were no other persons than ladies present at that time.

Tuesday following the Sunday on which Miss Gillett and prosecutrix had the conversation, the father of prosecutrix filed a complaint against appellant charging him with assault to rape. On the same day the senior Odell filed sequestration proceedings against the father of prosecutrix on a debt, sequestrating some horses and other property. There is some question as to which suit was filed first, although they were both filed the same day and within a short time of each other. This brings one of the serious questions in the case. The bill is lengthy, and in view of what has been said it is unnecessary to reproduce it. The bill practically rehearses the substance of the case. The defendant then offered the witness Thomas H. Floyd, who testified he was justice of the peace of precinct No. 1, Callahan County, and defendant offered to prove by him and could have proved by him that on the 10th day of August, 1915, subsequent to this alleged assault, defendant's father filed a suit in the Justice Court for sequestration against the father of State's witness, Emily Smith, the father's name being D. H. Smith, and that said suit for sequestration and the writ issued, seizing two horses and a wagon of the father of prosecutrix, and the suit was then pending; and the defendant would have further proved by the witness Floyd that on the same day that said suit was filed, that said D. H. Smith filed a complaint against the defendant charging him with assault to rape upon his daughter, Emily Smith, and the defendant procured from said witness the writ of sequestration, the affidavit and bond for sequestration, and the docket entries of said suit were also offered in evidence in connection with the foregoing evidence of the witness; all of which was objected to by the State for the reason that it was irrelevant and immaterial and not proper evidence by which to show the bias or feeling or prejudice of the State's witnesses Bessie Smith, Emily Smith and Uel Smith; whereupon counsel for the defendant stated to the court that this evidence was offered to show bias and ill-will, and prejudice of said witnesses against the defendant, and

was further admissible as a circumstance tending to show that said witnesses might have been or were biased and influenced in their testi-mony by their father against whom said sequestration suit was filed, they being of tender years, very young, and under the control of their parent. The court sustained the objection of the State and excluded the testimony from the jury.

In another bill in this same connection, which is very full and recites practically the main facts of the case, it is shown defendant offered W. F. Collins as a witness, who testified that he lived in Callahan County, and was acquainted with D. H. Smith and also acquainted with the father of appellant; that on or about the 26th day of October, 1915, he was in the town of Baird, in Callahan County, at the wagon yard, and there said D. H. Smith had a conversation with witness Collins, detailing the conversation. Appellant then offered to prove, and if permitted would have proved by him that D. H. Smith told him, the witness, that he was the very man he was looking for; that he wanted to effect a compromise with Wm. Odell, the father of the de-fendant; that he asked him what sort of compromise, and he said that if Odell would give him back his wagon and mules and black horse and give him $100 he would leave the State and carry the State's wit-nesses with him; that after some talk it was agreed that witness would see Odell and see if said compromise could be arranged; that he after-wards saw Odell and arranged for a meeting between Odell and Smith in the office of one of the lawyers for the defendant; and when they met witness wrote out an agreement, which is as follows: "Baird, Texas, 10-26-1915. Dear Sir: I have concluded to compromise with you and your son Willie Odell and stop all court proceedings now pend-ing against your son. If you will give me back my wagon and mule and your black horse, the one you call old negro also collars and bridles and the sum of $100.00 One Hundred Dollars, We agree to leave the State of Texas immediately on receipt of same."

That when they got to said office he read the proposition over to Smith in the presence of Odell; that said Smith said it was all right, and in the presence of William Odell signed his name thereto; that Odell then stated that he would not consider it unless the wife of D. H. Smith also signed it; that Smith then took the instrument and left; and in a short while returned with his wife's name signed to it; that Odell then stated that he wanted to see his attorneys before he agreed to it and that witness and said Odell then went to Abilene and submitted the matter to defendant's counsel, J. F. Cunningham, and also submitted to him the question as to whether or not $50 would be a reasonable fee for witness'.time and trouble in the matter. Counsel stated the fee was reasonable but that the compromise would not bind Smith and his wife; that they could take the money and horses and leave the State and then return and testify; that the agreement was an improper one and advised Mr. Odell to reject the proposition. That thereafter witness and said Odell returned to Baird and witness saw D. H. Smith and told him what Cunningham had said, and that Mr.

Odell declined the proposition; whereupon said Smith became very angry and said he intended to swear that he and his wife never signed the instrument, and asked witness if he would stay with him in the matter; that witness told Smith if he had to testify that he would swear the truth. The State objected to all this testimony for the reason that it was irrelevant and immaterial and not legitimate and competent testimony to be used for any purpose; whereupon counsel for the defendant stated that they offered the evidence to show a bias, prejudice and ill-feeling on the part of the children of said Smith who had testified in the case, and as a circumstance to. be considered by the jury in determining whether or not the evidence of said three children of D. H. Smith had not been influenced, prejudicial to the defendant by their father, they being of tender years and under the control and influence of their father; and they offered it for the purpose of showing that the prosecution had been instigated by said D. H. Smith for the purpose of extorting money from the father of the defendant and as a circumstance to show that he was using his children as witnesses for that purpose, but the court sustained the objections of the State and excluded all of said testimony from the jury.

The contention of appellant is that in view of the fact that the State relies for a conviction on the evidence of the three small children of Smith, and that the said children were under his care and control, the testimony offered was admissible to be considered by the jury in determining the extent of the bias, prejudice, ill-feeling, etc., which the children might have against the defendant by reason of the suit filed by the father of the defendant in which the mules and team and other property of their father were seized and taken from him, and for the further purpose of showing that the father of said witnesses instigated the prosecution in the first instance, he having sworn to the complaint for the purpose of extorting a compromise from the father of the defendant, and having failed in that he became angry, and further, that he exercised undue influence over his children in regard to their testimony. Appellant cites in support of this several cases, among others, Edwards v. State, 77 Texas Crim. Rep., 654, 172 S. W. Rep., 227; Wade v. State, 75 Texas Crim. Rep., 531, 171 S. W. Rep., 713; Burnam v. State, 67 Texas Crim. Rep., 8, 148 S. W. Rep., 757; Earls v. State, 64 Texas Crim. Rep., 537, 142 S. W. Rep., 1181. In addition they also cite Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611, and authorities collated in those cases; 33 Cyc., p. 1455, and notes; 23 Am. & Eng. Ency. of Law, p. 880, and notes.

We are of opinion that the court was in error. This testimony was admissible under the circumstances of this case. Neither D. H. Smith nor his wife, father and mother of the prosecutrix, testified in the case. They are, however, the only parties to whom Emily Smith, prosecutrix, testified that she told who it was that made the assault on her. The State did not use them. To all other witnesses she denied any knowledge of the identity of her assailant. On Tuesday after the conversation with Miss Gillett on Sunday, in which prosecutrix denied know-

ing the identity of the party, and after on the previous Saturday she testified she told her father and mother about it, her father filed this complaint charging appellant with assault to rape. The same day the sequestration suit was filed. There may be some question as to which was filed first, but that is not very material. They were filed about the same time and on the same day. Smith, father of prosecutrix, was indebted to Odell, the father of appellant. If Smith filed that complaint, anticipating or believing that the elder Odell was going to bring the sequestration suit, and they were in Baird, the county seat, at least it was before the justice of precinct No. 1, some twenty miles or such matter from where the assault is said to have been committed, it would be a circumstance to indicate that the complaint was filed on a compromise basis. Smith is the party who offered to compromise, and put it in writing, signed it, and had his wife to sign it. This was rejected by the elder Odell. These children were young, living with their father, and, of course, under his domination and control. The prosecutrix being the oldest one, who had just passed fourteen, the others being perhaps under ten years of age. These offers of compromise did not come from appellant's side of this case, but came from the prosecution side, the father of the prosecutrix. He and his wife were important witnesses for the State. If she told him that appellant was her assailant he could have so stated. Instead he filed complaint for assault to rape. The prosecutrix did not file it. Under these circumstances we are of opinion this testimony was legitimate. It certainly tended to show that these witnesses were or could have been influenced by their father, especially in view of the fact that he failed, as did his wife, to take the stand and testify in corroboration of the girl's statement, that she had informed him that it was appellant who assaulted her, and this was also emphasized by the fact that after she stated she told her father and mother, she denied any knowledge as to who her assailant was. Appellant did take the witness stand and deny the whole transaction, proving a complete alibi for himself, in which he was supported by practically all the testimony except that of the prosecutrix. This testimony was legitimate, and would show as contended and set out in the bill of exceptions, that Smith instigated the whole thing to avoid the result of the sequestration suit and to thus pay his debt, and further realize from it the wagon, mules, horses and collars, etc., and $100 in money.

We have not reviewed all of the bills in this connection, but they are practically along the same general line as those we here mention. This testimony should have gone to the jury, and because it was excluded the judgment will be reversed.

There is another question in the case, which is somewhat novel, and upon which the writer finds no authority directly in point. After the testimony was in the wife of appellant entered the bar where appellant was sitting in front of the jury and took her seat, having with her her baby something like a year old. The court suspended proceedings, retired the jury in charge of an officer and instructed that the wife

of appellant and his baby be excluded from sitting by her husband in front of the jury inside of the railing of the bar. When this was accomplished the jury was brought back and the argument proceeded. During the argument and while. Mr. Cunningham was addressing the jury for appellant, the appellant's little child approached the railing near where he was sitting; appellant reached down and picked up the little fellow and sat him on his knee, whereupon the court again suspended the proceedings and retired the jury and had the child removed from the father and sent back to its mother. The court signs this with the qualification, in substance, that he had a rule in substance and effect that friends and relatives, especially female part of them, should not sit with their husband, brother or relatives during the trial of a case. The wife had been under the rule, and had testified in the case. Of course, this all occurred after the case had been concluded so far as the evidence is concerned. This was the rule by the court, there being no statute in regard to the matter. The bill of exceptions recites further, which is not in any way qualified by the court, that the wife was sitting by the side of her husband, having the little child with her; that the child was not crying nor the wife weeping, and nothing unusual between them or in connection with them occurred, but they were simply sitting there by the side of appellant. The court seems to further think that this would have an undue influence upon the jury and arouse their sympathy for the defendant, and might affect their verdict either in acquittal or in minimizing the punishment. Defendant whatever else may be said about it did not get the minimum punishment; they gave him four years when the jury could have given him only two. It might be stated in a general way that courts and lawyers—bench and bar—of this State have been accustomed to the custom of relatives sitting by the defendant during the trial. Of course, the court would have the right to enforce discipline or decorum and prevent manifestations of an unseemly character. But so far as this case is concerned there seems to have been no ill effect except on the defendant as he received an enhanced punishment above the minimum. It will be difficult for this court to lay down a rule that would arbitrarily say to the trial court that he can or can not permit witnesses or friends or relatives to sit by an accused person during his trial, and if so upon whom the choice should fall who could sit by him and those who should be rejected. It certainly would not be held that he can exclude counsel. Besides, the statute does not require that the accused shall sit in any particular place inside or outside of the bar or railing of the courtroom should the room be so constructed. The statute does require in felony cases and in misdemeanor cases where there is imprisonment attached to the punishment, that defendant shall be present during the trial in the courtroom, but the statute does not specify any particular point at which he shall sit. The usual practice has been that the accused shall sit near his counsel, but this is the practice or custom and not the law, at least no such statute or provision has been pointed out, and the writer has failed to find any provision of law in reference

to it. Until the recent statute allowing the accused to go on bond during his trial, upon announcement of ready for trial he was taken from the bondsmen and placed in the custody of the sheriff, but under the recent statute this is not the rule. He must be present, however, during his trial, and the case will not proceed otherwise. Appellant may sit in the bar or inside of the railing if there is such, or he may sit on one of the benches in the audience. He still would be in the courtroom and would be present at his trial, and to the mind of the writer there seems to be very little force as to the position in the courtroom the accused occupies. If his wife is not permitted to sit with him inside of the railing, he might get outside of that and sit on a bench in the audience with her. Of course, he would have a right to do this, unless there is some rule of law which requires them to be separate and apart during the trial. The court might interfere if the wife was giving exhibition of her feelings that might undignify the court or influence the jury. She might be required to desist, and if she refuses she might be separated from her husband, but that would be upon the theory that it was unseemly in court like any other demonstration from the audience, but there ought to be something to indicate that the due order of the trial and dignity of the court was impeached or trespassed. The writer is not in harmony with the ruling of the court on that proposition under the facts detailed in the bill of exceptions and as shown by this record. What effect it had upon the jury we could only speculate outside of the fact that he received four years instead of two. This action of the court may have tended to impress the jury with the fact that he thought the wife was placed there, and that defendant subsequently took up his little child for the purpose of affecting their finding and thus place the jury in rebellion against appellant's cause. This act of the court may have influenced the jury against him. The judge is prohibited from discussing facts or commenting on the weight of the evidence. While this is not a comment in words and language on any fact introduced, or on the weight of the testimony, yet it still is a criticism of the defendant in that he had his wife sitting by him in front of the jury while the argument was in progress. It can not always be told what affects the jury in the trial of a case. We are of opinion, however, that under the circumstances of this case the court should not have done what he did.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, PRESIDING JUDGE (dissenting).—The opinion herein opens the door too wide and permits collateral evidence which is wholly inadmissile. No principle heretofore estalished would authorize the introduction of evidence that appellant's father had brought a sequestration suit against the witnesses' father, with which the witnesses had no connection, and especially that said fathers had agreed to compromise the prosecution and civil suit, with which the witnesses had no connection. And no precedent can be found for any such holding. On

the contrary, both principle and precedent are against the holding. (State v. Cunningham, 153 Pac. Rep., 499.)

The judge's action in removing, as he did, appellant's wife and child, was correct and presents no error. An accused should always be tried, as the law expressly requires, according to the law and the evidence, and not according to the effect and influence his wife and children may have on the jury. I think the judgment should be affirmed, not reversed.

HARPER, JUDGE (concurring).—In agreeing to a reversal of the case, I want to state that the general rule of law is that the acts of a third person who is not a witness can not be introduced as evidence to affect the credit of a person who testifies in the case. As stated in Vernon's Statutes (note 89, p. 638): "When the evidence fails to show the defendant's connection (or witness' connection) with the matter, it is improper and inadmissible to adduce in evidence against him the prejudicial acts and declarations of third persons, though such acts and declarations were offered in the behalf or in the interest of the person on trial," citing Favors v. State, 20 Texas Crim. App., 155, and other cases. However, there are some exceptions to the rule, as when the defendant authorizes the third person to act for him. (Burge v. State, 73 Texas Crim. Rep., 505.) The question is, where the evidence shows that the minor child is living with the father and under his control, and where the father offers to take the child beyond the jurisdiction of the court for a given consideration, is evidence of that fact admissible on the theory that the father may have influenced the child to testify as the child has testified, when the testimony is different from that first statement made by the child? Uel Smith is shown to be only seven years of age. On the trial he testified to hearing his sister say: "Willie Odell, you will be hung for this," and that he looked up and saw Willie Odell running off. On cross-examination, he admits that, on the day of the occurrence, "He told them he thought it was Crazy Adams whom he saw running off. At that time I thought it was Crazy Adams. I had seen Crazy Adams before. I know how he was dressed. When I saw him last he had on a blue shirt and blue overalls. At that time I thought the party I saw running off was Crazy Adams." So far as this record is concerned, the first time this boy ever said it was appellant running off was when he testified on this trial, which was after appellant's father had brought suit against the girl's father, and after the girl's father, according to the witness W. F. Collins, has approached him, and they together had gone to appellant's father, and the girl's father had agreed, if appellant's father would give him the team sequestered, the black horse and $100, he would carry the witness out of the State, and, when appellant's father refused to pay this amount, he became very angry. If the seven-year-old boy, Uel Smith, before this occurrence had said appellant was the person he saw running off, we would hold the testimony of Collins inadmissible. But, inasmuch as Uel Smith, according to this record, had claimed Crazy Adams was the man whom he saw running, and never changed this testimony until after appellant's father refused to pay his father,

the writer thinks, when the record shows the child was only seven years old, lived with and was under the control of his father, and the child on the stand gave no explanation of this change in his testimony, the evidence that the father, between the time witness said it was Crazy Adams and the time he testified it was appellant, had sought to obtain money and other considerations to suppress testimony, and when he failed to do so got angry because he could not obtain it, ought to have been admitted to aid the jury in determining whether the father was instrumental in having the little boy change his testimony. This was offered as a motive for the father to have influenced the child to change his testimony, to be considered by the jury. It may be of but little weight, unless the other facts and circumstances should convince the jury that the father had unduly influenced the child to change his testimony.