## Frank Jeter v. The State.

### No. 3739.    Decided December 4, 1907.

**1.—Seduction—Evidence—Reputation of Prosecutrix.**

Upon trial for seduction where a State's witness testified to the good reputation for chastity of the prosecutrix, the defense should have been permitted on cross-examination to show the general reputation of other women for chastity, with whom prosecutrix lived and associated. See opinion for testimony on this line which should have been admitted.

**2.—Same—Evidence—Impeachment—Surprise.**

Upon trial for seduction where the defense was surprised by the answer of its witness, and which was hurtful to defendant, and he had been led to believe by the witness that her testimony would be favorable, he had a right to contradict his own witness, and it was error of the court not to permit him to do so.

**3.—Same—Charge of Court—Law Must be Applicable to Facts.**

Where upon trial for seduction the evidence raised the issue as to whether defendant was the father of the illegitimate child of the prosecutrix, a general charge of the court that the act of intercourse between defendant and prosecutrix must have occurred by means of a promise to marry, and the court in applying the law to the facts confined the charge to this promise, the same was hardly sufficient and should have been made directly applicable to the facts.

Appeal from the District Court of Van Zandt. Tried below before the Hon. R. W. Simpson.

Appeal from a conviction of seduction; penalty, two years imprisonment in the penitentiary.

*Lively & Stanford,* for appellant.—On question of chastity: Mrous v. State, 31 Texas Crim. Rep., 597; Cabiness v. State, 1 Texas Ct. Rep., 500. On question of impeaching own witness: White v. State, 10 Texas Crim. App., 397; Tyler v. State, 13 Texas Crim. App., 207.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—This conviction was for seduction. The State relied upon the testimony of the alleged seduced female, Ella Taylor, for evidence to sustain the conviction with whatever corroboration is shown.

Ella Taylor, the prosecutrix, testifies that she and appellant had been engaged for some time at the time of the first act of sexual intercourse between herself and appellant; that his solicitations continued through a space of about nine months before she finally yielded to his importunities; that it occurred one night while returning from a party; that the first act of intercourse occurred in September, 1905, and continued until some time in December, 1905; her child was born on October 17, 1906. She further testified, "Defendant did not take me to the party; he hardly ever came to our house to take me anywhere, but would accompany me home from places." She further testified that she and her sister would usually go before night to these gatherings and some of the young men would accompany them home. Her father testified that appellant visited his daughter at his house; that he did not come often to see her, but would come home with her from gatherings. It seems to be a conceded fact that appellant and other young men who waited upon the prosecutrix and her older sister seldom visited them at their father's residence where they lived; that they would go to the gatherings of people in the neighborhood and young men would accompany them home from such gatherings. The evidence is directly conflicting as to the reputation of prosecutrix, some of the witnesses giving her a good reputation for chastity; others stated it was bad. Appellant testified that he was never engaged to the prosecutrix, but that he had intercourse with her during the fall of 1905, and that he had not had intercourse with her any time during the year of 1906. So it may be taken as a fact testified by both sides that the intercourse between appellant and prosecutrix ceased some time during the month of December, 1905, and it is an unquestioned fact that the prosecutrix, child was born on the 17th day of October, 1906, or in the neighborhood of ten months after these acts of intercourse ceased between the parties. Just prior to their act of first intercourse appellant wrote a letter to prosecutrix, substantially, as follows: "Ella, you have refused to do what I want you to do; this proves that you do not care anything

for me. So I don't suppose there is any use of my going with you any more." The following is the prosecutrix' reply: "Mr. Frank Jeter, Dear Old Boy: Frank you said when I decided to do what you said, for me to let you know. So I thought I would write and tell you that I will when you get ready. I couldn't get a chance to tell you yesterday. I had rather you wait until about Sunday night; if I could get to talk to you I would tell you why I want you to wait until then. I wish you would come and carry me to singing Sunday evening and we wouldn't come home till just before daylight if you think it would take you that long; tell me one night this week if you think you can come Sunday evening so I can iron my (other) corset cover. I hope you will come, sweety. I sure do want to kiss you. I never do get to kiss nobody but you. Excuse bad writing. I wrote this and nursed Vernon at the same time; didn't I have a big job. Your truest lover, Ella. S. W. A. K." There are some letters introduced written by appellant to the prosecutrix subsequent to the birth of the child, indicating an anxiety on his part to see the child and have a picture of it on a stamp so that he could carry it in his watch. One of the letters acknowledge the receipt of the picture, in which he states that the picture of the child has none of the Jeter family resemblance. There are some intimations in the letters that prosecutrix wanted appellant to do something, which he declined on the ground that she and her family were trying to trap him. Dr. Bell, at the instigation perhaps of appellant, and with the consent of the prosecutrix, examined her in July, 1906, and ascertained the fact that she was about five months advanced in pregnancy. While they were together and during a conversation between herself and Dr. Bell, she asserted that appellant was the father of her prospective child, but denied any engagement between them. Dr. Bell was used as a State's witness; his conversation in regard to this phase of the case is as follows: "Yes, in the conversation I talked with her and I was sorry for her and asked her who was responsible for her condition, and she said it was Frank Jeter; then I asked her why she allowed him to do it, and if they were engaged, and if Frank had promised to marry her, and she said that he had not promised to marry her; that they were not engaged, but that she just loved him so." This witness was one of those who testified to her bad reputation for chastity. Her condition became known in the community shortly after this examination by Dr. Bell. The father of prosecutrix testified that when Ella informed him of her condition and the circumstances of it, he and his son and son-in-law went to Squire Jordan, Justice of the Peace, and made a complaint and had appellant arrested for rape on his daughter; when the grand jury met, however, the indictment in this case for seduction was found. This perhaps is a sufficient statement of the case to bring in review the questions presented.

Harper testified for the State, among other things, to the good reputation for chastity of the prosecutrix. A bill of exceptions is signed by the court showing this condition in regard to this witness' testimony: That

he would have on cross-examination testified that the general reputation of the sister of prosecutrix for chastity with whom Ella Taylor lived and associated was bad and had been bad for two or three years before this trouble came up, and that witness knew of his own knowledge of her unchaste acts. This testimony was excluded. The court would not even permit counsel for appellant to make any statement as to why said testimony was material or what witness would testify. The court qualifies the bill as follows: "The sister of prosecutrix, whose reputation was inquired about, lived with her father and mother (and the testimony so showed without contradiction). The prosecutrix also lived there, and the court being of the opinion that a girl of prosecutrix' age was not compelled to abandon her home nor were the father and mother compelled to ostracize one wayward daughter in order to avoid an aspersion upon the character of another and therefore sustained the objection."

Another bill in regard to this same witness, in substance, is as follows: That Harper was the third witness for the State and testified that he knew the general reputation of the prosecutrix for chastity and that it was good. He was then asked by the defendant if he had a conversation with Bud Jeter on his gallery at Elm Grove before this trouble came up, in which he stated that the reputation of the Taylor girls for chastity, meaning Ella and her older sister, living with her in her father's family, was bad. The witness answered that he had the conversation at the time and place mentioned, and that he only stated that the reputation of the older sister of prosecutrix was bad. On motion of the district attorney, and over appellant's protest, the court withdrew the answer from the jury, and instructed them not to consider it as evidence. Counsel protested against the action of the court and offered to submit an authority to the court in support of the admissibility of said testimony, and the court stated in the hearing of the jury that he did not care to hear from counsel on any authority on that point, to which action of the court in excluding said testimony of the witness, Harper, from the jury and refusing to permit defendant to attempt to show the admissibility of said evidence, the defendant then and there excepted, etc.

In regard to the first bill of exceptions, we are of opinion that it was admissible. The facts show that the older sister had a bad reputation, and that she and the prosecutrix resided at the residence of their father. It further shows that they were in the habit of going to social gatherings in the neighborhood unattended by any male friend, but on their return from these gatherings the young men would attend them home. See Caviness v. State, 42 Texas Crim. Rep., 420. In the Caviness case it was proposed to be shown that the prosecutrix lived at the same house and associated with her two sisters and niece; that they were women of bad reputation, and that they were delivered of illegitimate children. On objection of the State this testimony was excluded. It was offered as tending to prove the real character of the seduced female. The prosecutrix in that case was delivered of a fully developed child in February, 1900. The court said in that case, "If she was an associate of these

women at the time indicated, it would be a fact tending to show her character for want of virtue and chastity. See also Mrous v. State, 31 Texas Crim. Rep., 597. It was held in that case the evidence should have gone to the jury. We think under this authority this testimony should have gone to the jury. The judge rejecting the testimony seems to have thought because they were living in the same house and under their father's roof, that the fact that prosecutrix associated with her sister of bad reputation, should not be used against prosecutrix, and he further seems to have conceived the idea that because to have so ruled would have required the father to ostracize his daughter from home. We do not understand what this has to do with the admission or rejection of testimony that proves or tends to prove a legitimate fact. Of course, the father was not required to drive his children from home, even if they were shown to be absolutely abandoned; he was not required to drive prosecutrix from his home or in any way ostracize her after her shame had been known and the child born, but there would be no question that the fact she gave birth to the child would be legitimate testimony, even though the father was not required to ostracize her. The evidence seems to be conceded, proved at least, by the State's testimony that the young men seldom came to the house to visit the girls, but that they would go to parties and social gatherings unattended except in company with each other, but that young men would accompany them home. They seldom went to visit the prosecutrix at the residence of their father. This testimony was admissible.

In regard to the second bill, it is shown that evidence was introduced through the witness, Harper, that he had stated to Bud Jeter that the reputation of the older girl, prosecutrix' sister, was bad, limiting his statement of bad reputation alone to the older sister. The court withdrew the answer of the witness and instructed the jury not to consider it and for the same reason stated by the court for the rejection of the testimony in the bill above discussed. We think this testimony was properly admitted and ought not to have been withdrawn.

The witness, Mrs. Lydia Norris, testified that she was an aunt of the prosecutrix and had known her all her life. She was then asked by appellant if she knew the prosecutrix' general reputation for chastity prior to the time of her connection with this case. The witness answered, "I never heard her reputation for chastity discussed before then." She was then asked by defendant if she had not stated to Lively & Sanford that morning in their office that she did know the reputation of Ella Taylor for chastity in the community in which she was living and that for chastity it was bad, and that witness and her brother, Isaac Taylor, now deceased, had often talked about it and deplored that fact; that Ella Taylor's family had become offended at them because they had remonstrated with her about her conduct with young men. It seems that Mrs. Norris was a witness for the defendant, and was placed on the stand to prove the bad reputation of the prosecutrix for chastity, and they alleged surprise at her answer and they insisted that they should be per-

mitted to refresh her memory by said conversation and explain their reason for putting the witness on the stand, and if she insisted upon her answer as given, they should be permitted to contradict her. The court refused to permit her to answer the question. Upon another trial this testimony should be admitted, if the matter presents itself in the same way as it does in this record. Where a party is surprised by the answer of a witness, which answer is hurtful to him, and when he is led to believe by the witness that it would be favorable, under our statute he has a right to contradict even his own witness.

Exception was reserved to the court's charge and special instructions requested but refused. The court, in a general way, charged the jury that before they could convict they must find from the evidence that the act of intercourse occurred alone by means of a promise to marry, and then give the following charge: "If you find the defendant had carnal knowledge of Ella Taylor and that defendant had promised to marry said Ella Taylor, yet if you find that Ella Taylor was moved to submit her person to the carnal embrace of defendant through any other inducement than a promise to marry her made by the defendant or if you have a reasonable doubt as to whether her consent to the carnal knowledge was given alone and in good faith relying upon a promise to marry her, you must acquit." And further, "If you find that prosecutrix was moved to submit to carnal intercourse through lust or a desire to get defendant to continue his visits to her, and not alone on an unconditional promise to marry in good faith relied upon by prosecutrix or if you have a reasonable doubt as to whether she was moved to consent through motives other than a promise to marry, you will acquit." Perhaps, under the facts of this case this charge was sufficient. The requested instructions were rather an amplification of the charges above mentioned. The testimony of prosecutrix along this line is about as follows: He said that all young folks that were engaged did that way; he told me that he would marry me if he ruined me and that he would marry me anyway." The testimony rather indicates from the letter written by appellant to prosecutrix and her reply that if there had been any engagement, that it was terminated, as appellant had written her there was no use in his paying her any further attention unless she would do what he wanted. Her reply would indicate, as copied heretofore, that she also understood the condition of affairs, and informed him of the fact that she was ready to comply and would remain with him during the night if it would take him that long to get ready. It is shown by testimony for appellant that prosecutrix was seen in the act of sexual intercourse with one Jack Craft, and there is testimony tending to show also that she was intimate with Tom Reed, and that Tom Reed was the father of her child, and that he had had intercourse with her during the month of January, 1906. If her testimony is true, and in this she is corroborated by appellant, that no act of intercourse had occurred between them after some time during the month of December, 1905, it would seem to be practically impossible for appellant to have been the father of her fully developed child born on the

17th day of October, 1906. It would be a very unusual occurrence doubt-less, for a woman to be pregnant about ten months with her first child, or even any subsequent children, if the testimony of physicians as· to the law of gestation is to be credited. Upon another trial we believe the court's charge should be perhaps a little more full at this point. The case of Nolan v. State, 48 Texas Crim. Rep., 436; 13 Texas Ct. Rep., 735, was reversed because of the failure to give the charge written prac-tically as appellant's special charges are written. Upon another trial, however, the charges can be more directly applied to the facts.

For the reasons indicated, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Henderson, Judge, absent.