CAPSHAW v. STATE.    (No. 3996.)

(Court of Criminal Appeals of Texas. April 12, 1916. Rehearing Denied May 10, 1916. Dissenting Opinion May 24, 1916.)

1. SEDUCTION ☞45 — EVIDENCE — SUFFICIENCY.

On a trial for the offense of seduction, evidence, though conflicting, *held* to sustain conviction.

[Ed. Note.—For other cases, see Seduction, Cent. Dig. §§ 80–82; Dec. Dig. ☞45.]

2. CRIMINAL LAW ☞747 — REVIEW — CONFLICTING EVIDENCE.

Where evidence is conflicting, it is for the jury to determine.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1714, 1727; Dec. Dig. ☞747.]

3. SEDUCTION ☞45—EVIDENCE—CHARACTER OF FEMALE.

In a criminal trial for seduction, evidence *held* to show prosecutrix's good reputation for virtue.

[Ed. Note.—For other cases, see Seduction, Cent. Dig. §§ 80–82; Dec. Dig. ☞45.]

4. CRIMINAL LAW ☞1092(11)—APPEAL AND ERROR—STATEMENT OF FACTS.

Where the court below in his qualification of accused's bills of exceptions stated that he referred to the statement of facts for the testimony "on this question or subject," the bills will be considered by the appellate court in connection with the testimony as shown by the statement of facts.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2837, 2841; Dec. Dig. ☞1092(11).]

5. CRIMINAL LAW ☞419, 420(1)—EVIDENCE—ADMISSIBILITY.

In trial for seduction, *held* not error to exclude evidence that prosecutrix's father was told by the district attorney that a bill for seduction could not be procured against accused because she had testified that the acts of intercourse were without her consent, although the prosecutrix immediately thereafter changed her testimony, remedying these defects; no offer being made to show that prosecutrix knew of the conversation.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 973, 975, 976, 980–983; Dec. Dig. ☞419, 420(1).]

6. SEDUCTION ☞42—EVIDENCE—ADMISSIBILITY.

In trial for seduction, evidence of unchaste conduct of prosecutrix's sister in prosecutrix's presence nearly two years after prosecutrix's seduction is inadmissible.

[Ed. Note.—For other cases, see Seduction, Cent. Dig. §§ 73–75; Dec. Dig. ☞42.]

7. SEDUCTION &#x2250;50(1) — INSTRUCTIONS — IN GENERAL.

In trial for seduction, instructions defining the crime *held* correct.

[Ed. Note.—For other cases, see Seduction, Cent. Dig. § 89; Dec. Dig. &#x2250;50(1).]

8. SEDUCTION &#x2250;50(3) — INSTRUCTIONS — CHASTITY OF FEMALE.

In a criminal trial for seduction, an instruction that an element of the offense was that prosecutrix was then "a virtuous and chaste woman, that is, that she had never before had sexual intercourse," was not erroneous as implying that the fact of sexual intercourse is the sole criterion of virtue, where the testimony was conclusive that prosecutrix was chaste, and the charge as a whole gave a correct view of . the law.

[Ed. Note.—For other cases, see Seduction, Cent. Dig. § 91; Dec. Dig. &#x2250;50(3).]

Davidson, J., dissenting.

Appeal from District Court, Angelina County; L. D. Guinn, Judge.

Robert Capshaw was convicted of seduction, and appeals. Affirmed.

E. J. Mantooth, of Lufkin, for appellant. C. C. McDonald, Asst. Atty. Gen., for the State.

PRENDERGAST, P. J. Appellant was convicted of seducing Miss Eula Scroggins. This is the second appeal. The first is reported in 73 Tex. Cr. R. 609, 166 S. W. 737. None of the points on which the case was reversed on the first appeal are raised on this.

[1, 2] Appellant contends the evidence was insufficient to sustain the conviction. The statement of facts is somewhat voluminous— 100 typewritten pages. We have carefully read and re-read and studied the statement of facts. In our opinion, the great preponderance of the testimony, without doubt, amply sustained the conviction. It is true appellant himself denied a promise of marriage and any act of sexual intercourse. On the other hand, the seduced girl testified positively to both, and she not only was corroborated by positive testimony as to both facts, but also was corroborated by many other facts and circumstances which were unquestionably shown to be true. It is true, that on some material points, there was a conflict in the testimony ; also that the prosecutrix on an examining trial and at first before the grand jury testified that the two acts of. sexual intercourse by her with appellant about a week apart were had not with her consent, but because she was afraid of him, and he threatened her. She frankly admitted on this trial, as well as on the first, that she had so sworn on said two occasions, and that she then changed her testimony and swore before the grand jury and on said two trials that she changed her testimony on this point, and then swore that both acts were with her consent, giving as a reason for her first so testifying and the change in her testimony that she so at first testified because she did not want her father and mother and other relatives and others to think that she would voluntarily submit and do such an act. All of this was fully developed before the grand jury, and, notwithstanding this conflict and change in her testimony, the grand jury believed her later statements and the explanation she made of why she made the first, and upon their oaths preferred the indictment against appellant. In addition, two petit juries and a trial judge, before whom all this was thrashed out, believed her testimony, and the jury upon their official oaths convicted him, and the trial judge refused him a new trial. These matters are left by law, and must necessarily be, to the jury and the lower court. There is very seldom, if ever, any contested case before us which does not show flat contradictions in the testimony before the jury, and frequently the most important witnesses on each side are impeached by their own previous statements. The question in every such event is for the jury, from a sifting of all the testimony to arrive at the truth, and when the testimony, as in this case, notwithstanding flat contradictions and impeachment by previous statements sworn to, or otherwise, is sufficient to satisfy the jury, and they believe one phase of it and disbelieve the other, this court has no right, and properly has no power, to say that the jury should have believed and found the reverse of what they did. We are not discussing that feature of the law wherein, as a matter of law, the evidence is insufficient to sustain the verdict. That does not arise in this case.

Of course, it is out of the question for us to give all of the testimony. We will not undertake to do so, but will give the substance of the material testimony which clearly authorized the jury to convict. We will not give the testimony in detail which would have authorized the jury to have acquitted; for the result of the trial and the verdict conclusively show that the jury believed the material incriminating testimony, and did not believe that of the appellant, which would have authorized his acquittal. For instance, if the jury had believed his testimony that he did not promise the prosecutrix to marry her or that he had had no act of intercourse with her, the jury would and should have acquitted him; but they did not believe his testimony on these points or any of his testimony tending to support him as to either of these questions. That was for the jury exclusively and the lower court.

[3] As to the incriminating testimony: We will first state that there is not a scintilla of testimony in this record other than the fact that she had the two acts of intercourse with appellant, being seduced by him under his promise to marry her before made, that in the slightest reflects upon her chastity or virtue. There was no testimony by any witness or any circumstantial testimony what-

ever which showed or tended to show that she ever said or did anything with any person whomsoever that could be construed even an imprudent act or saying at any time on her part prior or subsequent to the time appellant seduced and debauched her. Everything she did or said, as developed by this record, showed that she was a chaste and virtuous girl until this man seduced and debauched her. Appellant himself on direct examination swore:

"There was no reason, cause, or any talk that I had ever had with her or any conversation that led me to believe that I could have had sexual intercourse with her on a road like she said. * * *"

On cross-examination he swore:

"I at no time had reason to believe she would do that"—that is, have sexual intercourse.

The testimony shows that Miss Eula Scroggins, prosecutrix, was born and lived all of her life in the immediate neighborhood of where this offense was committed. The testimony showed that it was a thickly settled community in the country. Her grandmother and her uncles, the Shofners, her mother's brothers, had all of her lifetime also lived in the same immediate community. Several of her uncles were married men before this offense was committed. Others of them, though grown men, were unmarried. The visits among her various said relatives back and forth were frequent, and evidently had been from her infancy, and all of her life.

The appellant and his parents and brothers and sisters moved into said immediate neighborhood about December 1, 1912, and lived from that time for about a year between a quarter and one half mile from the Scroggins, and also in the same immediate neighborhood of the Shofners. Prosecutrix was then about 17 years of age. Appellant was about 20. The families at once became acquainted, and he at once began his frequent and devoted and exclusive attentions to the prosecutrix. He, and no other, took her back and forth, beginning about December 1st, to the various social functions and entertainments in the neighborhood and at the small towns only a few miles away, from when he began until he succeeded in ruining her. He did not always take her from her home to these various functions, but frequently did, and when he did not he would meet her at them and take her back to her home from them. Prosecutrix and several other witnesses testified positively to these facts, and he himself also in effect so testified. She and several other witnesses testified that appellant went to her home to see her nearly every Saturday night, or evening, and Sundays, and that during all that time from December 1, 1912, up to in May, 1913, he gave his attention exclusively to prosecutrix, and no other young man waited upon her during all that time. Appellant himself swore:

"I wasn't going with any other girl at the time I was going with this girl."

The prosecutrix testified that in January, 1913, she and appellant became engaged to be married and were to marry that fall. She is fully corroborated on this subject by the facts and circumstances proven from the time appellant became acquainted with her until he ceased his attention to her, and in addition by the positive testimony of her younger sister, Winnie. It was shown that one of her uncles, Grady Shofner, not only became engaged to be married to Pearl, one of appellant's sisters, after the two families began to live in the same immediate neighborhood, but actually married her in January, 1913.

The farms on which the Scroggins and appellant and his family lived were either adjoining or very close together. That part of the field where appellant worked during April was in sight of the Scroggins house and the road between the Scroggins and Capshaws. A person leaving the Scroggins house going the road to the Capshaws could be seen from where appellant then worked. Prosecutrix testified that late in the evening in the latter part of April, 1913, she started from home to the Capshaws to borrow some coffee; that appellant met her on the road; and that they thereupon had sexual intercourse, she relying upon his promise and engagement to marry her. It was shown that there was more or less timber and undergrowth along this road which would afford concealment in the act; that she, after the act, proceeded to appellant's mother's, saw and talked with her, and borrowed and took back the coffee with her. Appellant did not have his mother even dispute the fact of prosecutrix borrowing the coffee from her on said occasion, nor having a conversation with her at the time. The various facts and circumstances, as well as the birth of a child to prosecutrix just nine months practically to a day thereafter, fully corroborate her as to this act of intercourse. She further testified that on the first Saturday night of May, which was May 3d, she went with her mother, some other members of her family, and her uncle and appellant's sister from her home to another uncle's to a singing that night; that appellant did not take her from her home to her uncle's on this occasion, but that he was at said singing, and accompanied her back home that night; that they dropped behind the others in returning; and that appellant again that night had sexual intercourse with her. She is fully corroborated by a large number of witnesses to her and his attending that singing that night, and their return therefrom together to her home; that they dropped behind the others, and an ample opportunity was afforded for that act of intercourse. Appellant himself fully corroborated her on all these facts and circumstances, except that he had an act of intercourse with her that night. She and her mother and other witnesses testified that after that night appellant ceased any and all attentions to prosecutrix. He himself so swore. She testified that soon afterwards

she became aware she was pregnant by him; that no other person whomsoever had sexual intercourse with her at any time; that she tried repeatedly to see appellant, tell him of her condition, and demand that he marry her in accordance with his promise, but he assiduously avoided her, and she got no opportunity thereafter to tell him of her condition or make said demand upon him. He himself corroborated this in the fact that he says that after that first Saturday night in May he ceased all attentions to her and ceased going with her or being where she was when he could avoid it, in substance.

Some months later she got sick. A doctor was called to see her. When he first called, she had fever, and it seems he and no other then suspected her pregnancy. She seemed to get over that illness or the fever. Later, when she was about three months "gone," the same doctor was recalled to see her. He then suspected pregnancy, made some examination of her, and then told her father and mother what be believed of her condition, though he seemed then not to be positive that she was pregnant. The doctor swore that when he told her mother what he suspected, in effect, she did not believe that her daughter was pregnant; and, at appellant's instance, on his direct examination, the doctor swore that he asked her mother if Miss Eula had a sweetheart, and she said, "yes," that appellant might be considered her sweetheart, but she thought he had had no opportunity; that her mother also then said that she did not believe her daughter was in that condition; that she could not conceive of her girl doing a thing like that. Both her mother and father so expressed themselves to the doctor at the time.

It was shown that shortly after said first Saturday night in May prosecutrix's Grandmother Shofner became sick, and that she was sent for and went to wait upon her grandmother and do the work at her home for the family. It was also shown that some two or three of her uncles, the Shofners, grown young men, lived with their mother, her grandmother, and that she stayed at her grandmother's a week or two on this occasion, waiting upon her grandmother and doing the work. It was also shown that a young man some 27 years old, Cone Walker, her first cousin, lived with and worked for another uncle of hers at this time, that uncle living near where her grandmother lived, and the intimation was made by appellant that this cousin of hers had had sexual intercourse with her while she was up at her grandmother's, or that one of her uncles had had, and one of them, and not appellant, was the cause of her pregnancy. There is not a scintilla of evidence in this record that would intimate or justify any such imputation. She herself swore that no other man save appellant ever had sexual intercourse with her. Her cousin, Cone Walker, swore positively that he never at any time

had had intercourse with her, and that he never saw or heard anything that made him suspect even that she would do such a thing. The physical facts, without the shadow of a doubt, dispute that either of her uncles or her said cousin, or anybody else other than appellant, had sexual intercourse with her while she was at her grandmother's. The birth of the child to her just nine months to a day established the fact that she was begotten pregnant at the time she swore appellant first had intercourse with her. If any other two or three weeks thereafter had had intercourse with her, such person could not have been the cause of her pregnancy. There is not an intimation in this record, from start to finish, that either of her uncles, or her said cousin, ever at any time or in any way fondled or touched her person or kissed her or did or said anything that would indicate illicit intercourse between them. She was then a young 17 year old girl. They were grown men. There is no suspicion by her conduct or that of all or any of them that would indicate in the slightest any undue familiarity between them. No juror, and, we think, no reasonable person, because she did the most commendable act of going to wait upon her grandmother while she was sick and doing the work, her grandmother's sons, her uncles, grown young men, lived in the same family, or her cousin, another young man, lived in the same community, would conclude or suspect by those facts that either of her uncles or her cousin would be guilty of the heinous crime of ruining this young girl. So that, upon the whole, the testimony, a great preponderance of it, without any doubt, was sufficient for the jury to believe, as it did, that appellant was guilty of the offense with which he is charged, and that no other person was the cause of the ruin of this young girl.

[4] Appellant, both in his oral argument on the submission of this case and by his brief, groups his first four bills of exception, properly, as they are all on the same subject. They are lengthy. It is unnecessary to quote them. We will state their substance. In them he purports to state some of the testimony. The court in his qualification of the bills states that he refers to the statement of facts for the testimony "on this question or subject." He contends that we should thereupon go to the statement of facts, citing as showing that we should the following authorities which sustain him: Chalk v. State, 35 Tex. Cr. R. 126, 32 S. W. 534; Branch's Crim. Law, § 49; Gallaher v. State, 40 Tex. Cr. R. 308, 50 S. W. 388; Carter v. State, 59 Tex. Cr. R. 78, 127 S. W. 215; Haines v. State, 9 Tex. App. 410.

[5] We, therefore, must consider these bills in connection with the testimony shown by the statement of facts on the subject, which together with his bills show: That at once after it was definitely known prosecutrix was

pregnant, early in October, complaint was filed against appellant for her seduction, and that he at once had an examining trial, at which prosecutrix then testified, as stated above, that said two acts of intercourse were had without her consent and because of appellant's threats at the time; that shortly thereafter, during the same month, the grand jury convened, and appellant's attorney delivered to the foreman of the grand jury a typewritten copy of her said testimony on the examining trial, together with a long list of witnesses' names, so that the grand jury could take up his side of the case and try it in there, which it seems the grand jury did; that the prosecutrix came before them and testified at first as to the question of her consent and threats substantially the same as she had on the examining trial; that she was thoroughly examined at the time by the district attorney; that when she retired from the grand jury, her father at once went before it; that he was sworn and testified and retired; that a short time thereafter, some 15 or 20 minutes, prosecutrix again voluntarily appeared before the grand jury and again testified, though the foreman of the grand jury says, "I won't say positively that I didn't send after her; it could have been that I instructed her to be brought back there;" but he tninks he did not send for her. She swore on this second examination before the grand jury that the said two acts of intercourse were with her consent, and that her previous testimony before the grand jury and the examining court to the contrary was not true, and gave as a reason why she changed her testimony that she wanted to tell the truth and have the grand jury to know the truth, and that she testified on the two occasions before as she did because she did not want her father and mother and other relatives and others to believe that she would do such a thing as to voluntarily have sexual intercourse with appellant. The next day her sister, Winnie, voluntarily came before the grand jury and testified to what she did about appellant telling her on two different occasions while he was waiting on her sister that they intended to marry that fall as soon as they could. Prosecutrix, in answer to appellant's questions, swore that nobody told her after she left the grand jury room the first time that she would have to change her testimony to get a bill against appellant; that no one told her to go before the grand jury a second time; she just went herself; that she saw her father just before she went before the grand jury the second time, but he did not tell her to go back, nor to change her testimony, nor did he intimate to her that she would have to change her testimony. In his first bill he complains that the court refused to permit him to have Mr. Ivy, the foreman of the grand jury, to testify that, while John Scroggins, prosecutrix's father, was before the grand jury, the district attorney told him that the grand jury could not procure a bill against appellant, for the reason that his daughter Eula had testified that she and appellant did not have sexual intercourse by mutual consent, but that she permitted the intercourse because of appellant's threats to do her some serious bodily harm. In his second bill he complains that the court would not permit said grand juror to testify that at the same time the district attorney told prosecutrix's father that the grand jury must have some testimony corroborating his daughter Eula, in addition to Eula's testimony, that she and appellant were engaged to be married, and refused to permit the juror to answer that before the grand jury John Scroggins himself at that time testified that he had not heard of his said daughter being engaged to be married to appellant prior to May, 1913, or that any member of his family that he knew anything about knew anything about any such engagement. His third bill reiterates some of the same matters as one or the other of his first and second bills, and his fourth bill is as to like matters he attempted to prove by another one of the grand jurors. The court stated, and it was a fact, that John Scroggins, prosecutrix's father, did not testify at all in the case. He was present in the courtroom during the trial.

It was not shown by any of appellant's bills, nor was it claimed by him, that he would offer proof from any source to show that John Scroggins had said a word to either of his daughters about what the district attorney may have said to him while he was before the grand jury. It was not shown by appellant or claimed that either of his daughters heard or knew what had passed between the district attorney and their father, nor that the appellant was present at any time and heard or knew what had occurred at the time between the district attorney and said Scroggins; in other words, appellant sought to prove a conversation which occurred between the district attorney and said Scroggins simply and solely. We know of no rule or authority that would authorize the introduction of such testimony under the facts of this case. In fact, as we understand, all the authorities are against the introduction of any such testimony. It was pure hearsay and a conversation and statement between parties, neither of whom was a witness, and no witness as to any pertinent facts was present or heard or knew anything about it. For a collation of some of the authorities holding that such evidence is inadmissible, see section 1243, p. 468, of White's Ann. P. C., and notes 90 and 89, pp. 638, 639, of Vernon's Ann. C. C. P. The case of Odell v. State, 184 S. W. 208, recently decided, but not yet officially reported, is not in point in this case.

[6] As shown above, the offense alleged to have been committed, if so, was clearly shown to have been committed in the latter part of April, 1913. The first trial of this

case, when appellant was first convicted, was on November 9, 1913. The prosecutrix's baby was not born until January 24th following. This court reversed the judgment on the first appeal on April 29, 1914. The appellant introduced as one of his witnesses Earl Mathis, who testified that he never knew either Eula or Winnie Scroggins until about December, 1913, or January, 1914; he had not lived in the community or county where they had lived prior thereto, but in different distant counties; that he had married said Winnie May 17, 1914, and lived with her only some seven or eight months thereafter. It will thus be seen, and said witness' testimony shows, that he knew nothing about either of these young ladies at the time and for many months after this offense was committed, and until after the trial and conviction of the appellant the first time. In addition, it was shown that after living with his wife, said Winnie, some seven or eight months, he had separated from her and was very hostile to her and her sister, Eula. It was shown also that after said witness and Winnie were married they lived in the same community and kept house, and that said Eula visited them. Under this state of facts and that hereinbefore stated, the appellant offered to have his said witness Earl Mathis testify that soon after he married what he calls the Shofner boys—that is, the uncles of his wife—visited his house and paid her special attention; that when they were there she was in the best humor with them and paid little attention to him, and they were constantly taking hold of her by the arm and pinching her around over the body, and she would do the same with them; so much so that his attention was attracted to their conduct, and he spoke to her about it; that on one occasion when he was some 75 yards from his house painting, in looking towards his house, he saw his wife and one of her uncles getting off of the bed together, and he thought by this act there was something criminal between them; that another time while these uncles were visiting his house he walked out and saw through an opening that his wife moved over to where one of them was sitting on the bed, sat down by him, and commenced pinching him on the thigh in a manner that led him to believe that she was criminally intimate with her uncles; that he thereupon, as soon as her uncles left, took her to her father, and notified him that he would live with her no longer; that said Eula visited his house when her uncles were there and could observe the conduct of his wife with them, and when he visited her parents with his wife when her uncles were there they (his wife and said uncles) appeared to be intimate with each other; so much so that his attention was attracted by it; and that Eula made no protest of the conduct of her sister or uncles. This witness, as contended by the state, must have been a vile one in order to charge his wife from these circumstances of committing the crime of incest. All this conduct of his wife with her uncles, whom she had known and with whom she was raised up and daily associated all of her life, was in the presence of two or three of them and in his own presence and view, without any attempt to conceal any of her conduct from him, and she was not shown to have done anything privately or appeared to do so secretly. No doubt, his wife and her uncles would have testified his proposed testimony was false if that point had been reached. How it can possibly be claimed that this testimony of Mathis' wife, committed, if so, nearly two years after appellant had seduced and debauched and ruined Eula, was admissible, is incomprehensible to us. No principle of law would make it admissible. No reason whatever could be urged to show it was admissible. It was wholly immaterial, and the court correctly sustained the state's objection thereto, and did not err in refusing to permit such testimony to be introduced. The cases of Caviness v. State, 42 Tex. Cr. R. 420, 60 S. W. 555, Mrous v. State, 31 Tex. Cr. R. 597, 21 S. W. 764, 37 Am. St. Rep. 834, Jeter v. State, 52 Tex. Cr. R. 212, 106 S. W. 371, and Kelly v. State, 33 Tex. Cr. R. 32, 24 S. W. 295, are not in point, and neither of them are in point in this case to admit any such testimony. A mere reading of these cases will demonstrate this. It is unnecessary to discuss either of them.

Possibly it may be contended that the testimony of two old ladies in the community, Mrs. Lester and Mrs. Boone, was admissible for and tended to show a want of chastity by Miss Eula. Each of these witnesses show that they were unfriendly with the Scroggins family, and had been so the whole of the lifetime of Miss Eula. They say their families did not visit, although they lived within about a quarter or a half of a mile of the Scroggins during the whole lifetime of Miss Eula. Neither of them testified, or pretended to testify that Miss Eula's reputation for chastity was bad at or about the time this offense was alleged to have been committed, or at any reasonable time before or after that time. They each testified what they claimed it was at the time of this trial, which occurred in November, 1915, more than 2½ years after this offense was committed. Mrs. Lester swore that she was acquainted from hearsay with the then reputation of Miss Eula for virtue and chastity, and she said that so far as she knew personally it was good, but as to hearsay it was bad, or was not so good. Mrs. Boone said she knew the general reputation of Miss Eula for chastity and virtue, and that it was bad, not at or any time near the time this offense was committed, but at the time of the trial, more than 2½ years after the offense was committed, but she went further and said:

"I never heard anything against her until I heard of her getting mixed up with this Capshaw boy [appellant]."

Then she said that she had the reputation of going around with the drunken youngsters; that her Uncles Howard and Weaver got drunk right smart, and she did not think she ought to have gone with them when they were drunk. Then she further said:

"I never heard anything more about the conduct of Miss Eula Scroggins with her kinfolks before I heard of Capshaw than them going around that way with them when they were drunk and being with them when they were drunk." That a great many people censured the girls for that.

Then she concluded her testimony:

"I don't stir out much. So far as what I actually knew about it myself, I didn't know anything, you might say, because I don't go out."

So that it is seen that by this last witness' testimony she absolutely knew nothing, and that the only thing she purported to state was that she had heard that Miss Eula went with her uncles sometimes when they were drunk. The sole testimony in this record about either of her uncles ever even drinking was that in company with appellant himself on that 3d day of May, the last Saturday, they were with him and drinking, but none of them were drunk. On the other hand, appellant swore positively, "I drank a good deal along about that time," that is, on this 3d day of May, and that he was drinking that night; that he drank liquor whenever he could get any to drink. He also admitted that at least at one place where these public entertainments were given which he attended he was drunk. As stated, there is not a particle of testimony in this record that shows that either of her uncles were drunk at any time or on any of these occasions. Appellant's father also swore that appellant drank whisky for a good long time, that he drank ever since he could recall, and that he also drank whenever he could get it. So that the only person with whom Miss Eula ever went who was drinking was appellant himself, and not either of her uncles at any time or place.

There appears in the record a paper containing quite a number of objections to the court's charge and numerous requested special charges. It is certain from these objections and special charges that the court corrected his main charge, and by giving the two special charges which he did corrected his charge to meet, and did meet, every one of said objections except one. The court's main charge, with these special charges which he gave, presented every issue raised by the testimony, and in some instances much more favorable to appellant then the law or the facts justified.

[7] The judge in the main charge first told the jury the offense for which appellant was indicted, and that he had plead not guilty; then told them the burden of proof was on the state, and he was presumed to be innocent until his guilt was established by legal evidence beyond a reasonable doubt, and in case they had a reasonable doubt as to his guilt, they must acquit him. Next, in a separate paragraph, he defined the offense to them as the statute prescribes. His charge then proceeds:

"Fourth. Seduction means to lead away a female from the path of virtue; to entice or persuade her by means of a promise of marriage to surrender her chastity and have carnal knowledge with the man making such promise.

"Fifth. Before a conviction can be had in this case the jury must believe and find from the evidence beyond a reasonable doubt the four following propositions:

"(1) That the defendant, Robert Capshaw, was an unmarried person, and did on or about the 20th day of May, 1913, in Angelina county, state of Texas, have carnal knowledge with Eula Scroggins, and that she was at the time an unmarried female under the age of 25 years.

"(2) That at the time and up to the time of such carnal knowledge, if any, the said Eula Scroggins was a virtuous and chaste woman; that is, that she had never before had sexual intercourse with a man.

"(3) That such act of sexual intercourse, if any was had, that the female, Eula Scroggins, was actuated alone on the promise of marriage made to her by the defendant, and that she relied solely on said promise of marriage, and not on any other consideration or inducement, such as lust, or passion, or fear, or threats, or any other consideration or motives.

"(4) That at the time of such sexual intercourse, if any, the said Eula Scroggins was under the age of 25 years, and that Robert Capshaw was an unmarried male person.

"Sixth. If you have a reasonable doubt as to whether or not each and all of the above and foregoing four propositions have been established to your satisfaction by the evidence, you will acquit the defendant.

"Seventh. Now, if you believe from the evidence beyond a reasonable doubt that the defendant Robert Capshaw, did, in Angelina county, Tex., at any time within three years before the 29th day of October, 1913, seduce the said Eula Scroggins as the same has been above explained to you and have sexual intercourse with her as aforesaid, you will find the defendant guilty of seduction and assess his punishment at confinement in the penitentiary for any term of years you may see fit, not less than two nor more than ten years."

Then he next followed with a full and correct charge to the effect that Eula Scroggins was an accomplice, and she must be corroborated, as required by law. His charge on this subject is accurate, full and has all the time been held correct by this court. Then he proceeds:

"Ninth. You are charged that, if the evidence raises a reasonable doubt in your minds as to whether or not the defendant, Robert Capshaw, had sexual intercourse with Eula Scroggins, or whether or not he was engaged to marry her, the said Eula Scroggins, or whether or not she consented to have such sexual intercourse, if any, on any other consideration than a promise of marriage, such as fear, threats, etc., you will acquit the defendant, as the evidence must establish to your minds beyond a reasonable doubt that the defendant did, in fact, have sexual intercourse with the said Eula Scroggins, and that he was engaged to marry her at the time of said sexual intercourse, if any, and that she did consent for him to so have such sexual intercourse, if any, on the consideration alone of his promise of marriage, if he did make such promise."

Then gave appellant's specially requested charges Nos. 4 and 7, as follows:

(No. 4.) "You are charged, in connection with the main charge of the court, that Eula Scroggins could be seduced one time only, and you cannot convict the defendant for any other intercourse, if any, except the intercourse, if any, testified to by Eula Scroggins on the road from her house to the defendant's home, if any intercourse you find they had on or about May, 1913, and before the intercourse, if any, testified to by Eula Scroggins that took place in the road from Louis Shofner's to her home on a Saturday night."

(No. 7.) "You are further instructed, as a part of the law of this case in connection with the main charge of the court, that if you believe from the evidence that the prosecutrix, Eula Scroggins, did not rely solely and alone upon the absolute and unconditional promise of marriage by the defendant, if any such promise there was, but that she was moved to let the defendant have the alleged sexual intercourse with her through lust, or partly through fear and partly through lust, then it is your duty to acquit the defendant, and this though you should believe from the evidence that the defendant promised to marry the prosecutrix, Eula Scroggins, which promise was a part though not the main and only reason or inducement, or, if you have a reasonable doubt as to such facts, you will return a verdict of not guilty."

[8] Appellant's main attack on the court's charge is the last few words of the second subdivision of the fifth paragraph of the court's charge above quoted, claiming, in substance, that these words, "that is, that she had never before had sexual intercourse with a man," should have been omitted; his contention being that the fact of sexual intercourse is not the sole criterion of a woman's chastity. Even if it should be conceded that appellant's contention in this particular was correct, yet, taking the whole charge on this subject, there can be no doubt that the jury could not have been misled in this particular. It may be possible that in some cases it might be better to omit said words, but in this case, as shown above, there is not a particle of testimony which would show or tend to show that the prosecutrix was an unchaste woman at the time appellant seduced and debauched her. The testimony shows that she was a chaste woman prior to that time, and has been ever since. This court has all the time and in many cases held:

"The law presumes a female to be chaste until the contrary is proved." Legrone v. State, 12 Tex. App. 426; Curry v. State, 72 Tex. Cr. R. 469, 162 S. W. 851; Blackburn v. State, 71 Tex. Cr. R. 628, 160 S. W. 687; Bost v. State, 64 Tex. Cr. R. 477, 144 S. W. 589; 1 Wharton's Crim. Ev. p. 668.

Mr. Wharton says:

"While the chastity of the prosecutrix is an issue and must be proved as an essential element, it need not always be proved in the first instance, as it is presumed; and in such cases, if the accused relies on the fact of unchastity, the burden is on him to establish it."

In the Curry Case, supra, we cited these authorities and quoted Mr. Wharton as above with approval. In addition in that case we said: The law presumes a young girl was chaste prior to the time an accused seduced and debauched her, and that, the law so pre-

suming, the jury could do so and act upon such presumption. The charge of the court in this instance was not in conflict with Putman v. State, 29 Tex. App. 457, 16 S. W. 97, 25 Am. St. Rep. 738, but upon the whole substantially complied with that decision even. So that in no event does appellant's attack, or any of them, on the court's charge present any error. The court correctly refused to give all of appellant's charges which he did refuse, even if the question of the court's refusal of them is raised in such a way that we could review them.

There was no error in the trial of this cause shown by the record, and the judgment will be affirmed.

DAVIDSON, J. (dissenting). The state's theory is that the alleged seduced girl, Eula Scroggins, met defendant for the first time in December, 1912, and became engaged to him the following month, January, 1913. It seems from the evidence that appellant did not visit the girl at her home except incidentally, and then by going with her from and to social functions and prayer meetings and in company with other people. There were no letters, notes, or love-making and things of that character occurring between them, and no courtship or love-making shown as is usually done in such cases. She testified that during the latter part of April in going from her father's residence to that of appellant's family she met defendant on a branch, or between the two places, which were about a quarter or half mile apart, and had intercourse with him; that at that time he said something about an engagement of marriage. When the intercourse ended she went to appellant's home and obtained from his mother some coffee for which her mother had sent. She did not see appellant any more for several days, and then saw him passing her father's residence. He did not speak to her, nor she to him. Shortly afterward there was a singing function at the home of an uncle of prosecutrix, whose name was Shofner. Prosecutrix, her mother, sister, appellant's sister, her brother, and a number of people attended the singing, all going from the residence of the prosecutrix. Appellant did not accompany these people, but returned from the singing with prosecutrix in company with the other designated parties. Mr. Ivy and another party on horseback overtook this crowd as they were going to the singing function. Ivy dismounted and walked with prosecutrix to that place. When the singing ended the same crowd returned to the home of prosecutrix, and appellant walked with her home. She says she and appellant fell a short distance behind the crowd and engaged in sexual intercourse. The two acts mentioned were all that occurred between them. Appellant denies both the promise of marriage and acts of sexual intercourse at any time or place. He testifies further he never called on her at her home spe-

cially, and the few times he was there was with a crowd of young people who gathered at her father's residence for social purposes as they did at other places in the neighborhood, and all the association ,with and attention to her on his part were incidental 'and in the manner stated. As to the attentions to the girl, as above stated, there seems to be but little contradiction, if any, in the record. The girl became pregnant and gave birth to a child. There was no information given by her to any of her family as to this intercourse until the physician informed her mother that her daughter was pregnant, something like three months advanced. The mother testifies she did not believe it and declined to believe it until the girl admitted the fact. Shortly after this statement to the mother appellant was arrested, and an examining trial followed. On that trial prosecutrix testified fully. Her testimony was reduced to writing, and after making corrections she signed it, and it is a part of the record in this case. On that trial her testimony excluded seduction. She not only testified that she did not give consent, but submitted to him on account of threats on his part and fear of him. Her evidence, in fact, shows compulsion, excluding consent. Later she was before the grand jury and testified as she did on the examining trial. It is unnecessary to repeat that testimony. It was practically identical with the testimony before the examining court. She was then discharged by the grand jury. Her father then came voluntarily before the grand jury without being summoned and immediately after her departure. The district attorney informed him what the girl had testified and her failure to make out a case of seduction; that she had denied mutuality and consent and testified to facts that excluded seduction and showed compulsion and threats to force her to comply ,with his desires, and through fear she did comply. It is not my purpose here to state the details of the language used, but only the substance. The district attorney also informed her father that in order to constitute a case of seduction, in addition to consent and mutuality on the part of the girl, prosecutrix must be corroborated as to the marital contract or agreement. The father testified before the grand jury that he nor his family ever heard of any marital contract between appellant and prosecutrix. He took his departure from the grand jury room. After being gone about 25 minutes or such matter, the prosecutrix voluntarily returned before the grand jury, changed her whole testimony, and stated that she did agree to the act of intercourse because of the promise of marriage. This marriage was to be consummated in the fall, but, if anything got wrong with her, he would marry her at once. She says this conversation occurred at the time of the first act of intercourse which occurred on the branch. The next day her sister, who seemed to have been some miles away and at home, came before the grand jury and testified that appellant had stated to her that he and prosecutrix were going to get married in the fall, and if necessary, or if anything happened to the girl, they might get married earlier. This may be for the present a sufficient statement of the case.

Several bills of exception I will consider together as they present substantially the same matter, and recite that two of the grand jurors, one of them being the foreman, Mr. Ivy, were tendered by the defendant to prove matters heretofore mentioned which were rejected by the court on objection of the state. After the matters above detailed occurred before the grand jury, and after the conversations between the district attorney and the father of the two girls in the grand jury room, the father disappeared from the grand jury room and was seen with prosecutrix on the street or at a store. In a few minutes thereafter—25 or 30—she left her father and went voluntarily before the grand jury again, and at this appearance before the grand jury she changed her entire testimony to what she testified on the final trial. The defendant offered to make proof of these facts, which the court excluded. By another grand juryman it was offered to prove the same facts. It was after these matters occurred that the girl changed her testimony from compulsion to consent, and the sister came the following day and testified before the grand jury that appellant had stated to her that he and prosecutrix intended to marry in the fall, and if anything happened to the girl in the meantime they would marry at once. The mother had never heard of the marital contract, nor had the father, and the girl, who testified to it, never communicated her knowledge of it to anybody so far as this record is concerned until she went before the grand jury. I am clearly of the opinion that the conversation between the district attorney and the father of the prosecutrix in the grand jury room, in connection with subsequent acts and sending the girl back before the grand jury, should have been admitted. Relations of the parties and what occurred before the grand jury, the fact of the father being informed that the state had no case as a basis of prosecution for seduction, his going to the girl and her immediate return before the grand jury, and radically changing her testimony from what she had previously stated before the grand jury and before the examining court prior to the meeting of the grand jury, so placed this matter that what occurred between the district attorney and the father became material to explain her conduct as well as to show the connection of the father with this radical change. The subsequent action of the daughter in her conduct and her voluntary return before the grand jury, the change of her testimony so as to make a new case in its entirety from compulsion to mutuality, rendered what occurred between the father and

the district attorney in the grand jury room of such moment that his acts and conduct after leaving that body should have gone to the jury as well as what occurred in the grand jury room above mentioned. This question was discussed in Odell v. State, 184 S. W. 208, recently decided. In that case the presiding judge of this court dissented. I do not care to discuss that case; I simply refer to it. It is but fair, and it seems to me the only reasonable deduction, to say that the girl could not have known a change in her testimony was necessary except by information from the father after his return subsequent to the conversation he had with the district attorney. Fabrication or manufacturing of testimony is always admissible. It is evident to my mind that what occurred between the father and the girl after he left the grand jury room with the information therein received was the cause of her returning voluntarily before the grand jury and radically changing her testimony. I cannot agree to the proposition that this testimony was hearsay, nor can I agree that it was immaterial, as is announced by the majority opinion. There was a powerful reason generated suddenly for this radical change in the girl's testimony, as well as the newly discovered corroborative evidence from the sister as to the marital contract. If perjury had been assigned on her last evidence before the grand jury and on a trial of that case, would there be any serious doubt that the testimony would have been admissible as bearing on the guilt of the girl? I think certainly not. It would have borne on more than one phase of the charge of perjury based on her last testimony. Again, had the father been charged with inducing his daughter to swear falsely—subornation of perjury or as an accomplice—would it be questioned that the testimony would have been admissible? Surely not. It would have been material and strongly probative to show and sustain the charge of subornation of perjury or that he was an accomplice in advising the changing by the daughter of her evidence. Such matters can be shown by circumstantial evidence as well as by direct and positive testimony. It could be used to show motive, animus, or falsity of given testimony, to affect the credit of the witness, and furnish a reason for the sudden flashlight that awakens the memory from former forgetfulness. Her change of testimony had a basis and reason somewhere and was produced or induced by some cause. What occurred in the grand jury room between the father and the district attorney seems to be the keystone in the arch of the reconstructed edifice of this case. From the occurrences in that room a new theory was evolved, and the girl was sent again before the grand jury to change her testimony to sustain it. If these facts were not material, it would be somewhat difficult to show materiality. There was perjury somewhere, either before

the father's advent in the grand jury room or after his return from it. If her last testimony was false, the defendant had the right to show it, and, further, that her father induced that perjury or was instrumental in it. In such event the materiality of this testimony could not be questioned, and most assuredly not if the father was on trial for subornation of perjury. Nor would it be less cogent against the girl to show falsity; for, in view of this record, she had sworn falsely one time or the other. She says she did it the first time because she did not want her family to know she had consented. The sudden change in her testimony in 25 or 30 minutes is hardly explainable on that ground.

There is another question raised by bill of exceptions in regard to the evidence of the witness Mathis. This raises a question that has been often discussed in the jurisprudence of this state, and the evidence should have been admitted. The question briefly is: It was sought to be proved by Mathis that the prosecutrix was associating with his wife at the time these matters were going on impugning her chastity, and that his wife was a lewd woman, on account of which he ceased to live with her; that prosecutrix in this case was a sister of Mathis' wife. There is some testimony also that might be mentioned in this connection to the effect that another party or some other party may have been the father of this illegitimate child. I do not care to go into that phase of the case, however, here. That lewd association and matters of that sort can be proved is settled in Texas, and I cite Caviness v. State, 42 Tex. Cr. R. 420, 60 S. W. 555; Mrous v. State, 31 Tex. Cr. R. 597, 21 S. W. 764, 37 Am. St. Rep. 834; Jeter v. State, 52 Tex. Cr. R. 212, 106 S. W. 371; Kelly v. State, 33 Tex. Cr. R. 32, 24 S. W. 295. The Jeter Case, supra, seems to be very much like the present case in many of its features in regard to the testimony.

Another question is suggested. Exception was reserved to the court's charge as well as his refusal to give requested instructions. The court charged, among other things, with reference to the definition of seduction and as to seduction as follows:

"(2) That at the time and up to the time of such carnal knowledge, if any, the said Eula Scroggins was a virtuous and chaste woman; that is, that she had never before had sexual intercourse with a man."

The court nowhere corrected this, as I understand the charge, and appellant asked instructions which tended to present the definition of seduction in its proper legal light. I wish to say here the law is that a woman may be unchaste, not virtuous, and yet not indulge in sexual intercourse. This is the recognized rule in Texas. It was so held in Putman v. State, 29 Tex. App. 457, 16 S. W. 97, 25 Am. St. Rep. 738, and in a long line of subsequent cases. Testimony to the effect that the alleged seduced female's repu-

tation for virtue and chastity is bad has always been held admissible as tending to show her want of chastity, and also to show that she was not the subject of seduction. Applying the law to a case, the court should not limit seduction to the fact of intercourse as the criterion of unchastity. This is not the law. Of course, the crime of seduction cannot be had without the act of sexual intercourse, because the statute so provides, but the act of intercourse is not the criterion of virtue; at least it is not the statutory criterion. A prostitute may have sexual intercourse with a man, but that would not be the test of seducing her. The bawd cannot be led away from the path of virtue. She does not travel that pathway. As I have heretofore understood, the law of seduction consists in leading from the path of rectitude and chastity the alleged seduced female followed by debauching her body. Correct decisions have kept this in view, and cases have been reversed where charges were refused presenting that very question for the guidance of the jury. Seduction is the leading away by blandishments, arts, and wiles of the seducer, thus getting the woman's mental condition where the seducer can accomplish his design upon debauching her body and securing sexual intercourse. The mind and body must both be debauched in order to constitute seduction. Fornication is not seduction, nor is adultery. The Legislature has so enacted, and this court will hardly claim the power to create another statute with a different definition. The court's charge was entirely too restrictive and not the law, and the jury may have concluded, and doubtless did conclude, from that paragraph of the charge that, if the defendant had intercourse with the girl, she was therefore seduced.

There is another question which the writer thinks is reversible. The girl testified the first act of intercourse occurred on a branch between the residence of appellant and that of prosecutrix, that they met there accidentally, and that she was not expecting to meet him. He denies seeing her or having any conversation or sexual intercourse with her. She states this was the first act of intercourse. The other act occurred some days later. She testifies to but two acts. Appellant excepted to the court's charge and requested instructions submitting this question, that is, that the jury should be limited in their finding to the first act, if they should find him guilty, and that, if she was seduced at all, it was on that occasion. While the testimony of the subsequent act was admissible under the decisions, yet the second act was not and could not be seduction. If the second act had never occurred, and the first did, if seduction at all, it would constitute seduction, and this without reference to the second act. A girl cannot be seduced twice by the same man by different acts and different times. If she was seduced by appellant and her body debauched, it was done at the time of the meeting on the branch. I am of opinion that appellant is correct. The state should be limited to that act by the charge of the court. I think this needs no discussion.

There is another serious question which the writer thinks is well taken. The evidence is not sufficient to sustain a conviction for seduction. Twice prosecutrix testified under oath—once in writing and taken down at an examining trial, and once before the grand jury. On both occasions she denied that she ever consented for appellant to have intercourse with her, that he did so by means of compulsion and threats producing fear in her, and that under such conditions she submitted. The facts do not show even after all the changes in her evidence a case of seduction; for she swears she was afraid to permit his embraces, and so told him. She told him she was afraid of being "caught" and it would be found out on her, but that on his agreement to marry if pregnancy ensued she permitted him to have intercourse with her. If this is true, it is not seduction. If it is not true, and the compulsion theory is correct, then admittedly the case could not be one of seduction. The girl testified that after they had agreed to be married he seldom went with her, and then only in company with others; that he had never mentioned to her until he met her on the branch that evening anything with reference to having intercourse with her, never alluded to it, and on that occasion he so terrorized her that she permitted him to have sexual intercourse, and she never mentioned this until her pregnancy was discovered, and this when the doctor revealed the fact to her mother that she was pregnant. She accounts for this now by stating that she did not want her family to know that she had consented. She put it on the ground of compulsion and threats, but she did not change this testimony until after her father had been before the grand jury and had been informed by the district attorney of the want of essential testimony to show seduction. It was not till then her whole testimony radically changed, and her sister was brought in to corroborate her on the promise of marriage. This is too much of a Hyde and Jekyll case, it occurs to the writer, to authorize the incarceration of the defendant in the penitentiary on an infamous conviction. Not only so, but she never mentioned to appellant the fact that she was pregnant. Some great judge in Texas in its early jurisprudence said—it may have been a quotation, but he said—the jury should "look with holy horror upon amended swearing." This was more than amended swearing. It was a radical substitution of facts totally at variance with the girl's previous testimony and a change from threats,

compulsion, and force producing fear in her to submissive compliance with his wishes to gratify him and her amorous desire. The writer is not willing to sustain convictions on testimony of witnesses who can in so few short moments change so radically their whole testimony as is shown by this record. This girl knew the real facts as well before the examining trial as she did after the district attorney informed the father that her evidence precluded seduction if they were facts. The girl testified positively and directly to intercourse by compulsion; had gone over and corrected her testimony in the examining court, and signed and swore to it. She had gone before the grand jury and swore to the same statement that she did before the examining court. After the retirement of her father from the grand jury room a change came over the spirit of her dream, and she went back voluntarily in a few moments, and one of the grand jurors said she was crying, but she changed her whole testimony as squarely and as radically as it is possible to be changed, contradicting everything she had previously testified. Force, threats, and compulsion had become mutuality and consent.

I am not willing to lend the judicial power invested in me to affirm a case under such a record. I therefore respectfully dissent.